234 So.2d 556

**AVCO CORPORATION, a Corp., and Donald Hugh Ellis**

v.

**Mrs. Cleolar Douglas RICHARDSON.**

**8 Div. 257.**

Supreme Court of Alabama.

April 9, 1970.

Rehearing Denied May 15, 1970.

Joseph T. Conwell, Huntsville, for appellee.

Bell, Richardson, Cleary, McLain & Tucker, Huntsville, for appellants.

COLEMAN, Justice.

The defendants appeal from a judgment for plaintiff in an action for personal injury allegedly sustained by plaintiff as the result of a collision between an automobile in which plaintiff was riding as a passenger and an automobile which the defendant, Ellis, was driving.

The other defendant is AVCO Corporation, hereafter referred to as AVCO. Plaintiff alleges that the automobile in which she was riding in a southerly direction, was lawfully stopped at a stop sign at a street intersection; and that defendant, Ellis, who was driving an automobile, also in a southerly direction, so negligently drove his automobile that it ran against the rear end of the automobile in which plaintiff was riding and caused plaintiff's injuries

Plaintiff alleges that, at the time and place of collision, Ellis was acting within the line and scope of his employment as an employee of AVCO.

### 1. Refusal of Affirmative Charge.

AVCO assigns as error the refusal of Charge 8 which recites:

"I charge you, gentlemen of the jury, that if you believe the evidence in this case, your verdict cannot be for the plaintiff, Mrs. Cleolar Douglas Richardson, against the defendant AVCO Corporation."

AVCO insists that it is entitled to have Charge 8 given because the evidence fails to show that, at the time of the collision, Ellis was acting within the line and scope of his employment by AVCO.

It appears to be undisputed that Ellis was an employee of AVCO during the month of November in which the collision occurred; that he had left the office where he was employed at some time after three o'clock in the afternoon; and that he was driving his own automobile in which he had placed a box containing telemetry equipment which AVCO had manufactured for the National Aeronautical Space Administration.

The testimony of four witnesses bears on the question whether Ellis was acting within the scope of his employment at the time and place of the collision.

Gene Harwell, a police officer, testified that he arrived at the scene of the collision at 3:47 p. m.

Oran F. Richardson, husband of the plaintiff, testified that he was driving his car in which plaintiff was riding; that he had stopped with his foot on the brake and was looking for oncoming traffic; that he felt a blow from the rear and jumped out of his car. The police officer came along; ". . . . He actually came along by himself. We didn't have time to call for him." Plaintiff's husband testified further that he and his wife subsequently carried Ellis and his box of electronic gear in their car to a motel; that Ellis went in and came back in about five minutes; then all three of them (witness, Ellis, and plaintiff) proceeded to the hospital; and, later, Ellis' wife came to the hospital and picked up the electronic gear from the Richardson car.

Steven Moxley, manager of AVCO's Huntsville operation, testified that Ellis was employed by AVCO during the month in which the collision occurred; that Ellis was under Moxley's direct supervision; that, on occasion, Moxley sometimes left Ellis in charge of the office; that, on the day of the collision, Ellis was not in charge of the office to Moxley's knowledge; that Moxley is "almost positive" that he was in Huntsville on that day but he "wouldn't swear to it"; that Ellis told Moxley about the accident on the day thereafter; that, on two or three occasions, Ellis had previously delivered electronic equipment, like that in his car at the time of collision; that Ellis was authorized by Moxley to do that; that, on the day of collision, Ellis would have had authority to deliver a box of this type to the Arsenal without asking Moxley because it was not necessary for Moxley to delegate the authority on each trip; and that Moxley, as manager of AVCO, had given Ellis general authority to do that.

Moxley testified further that the approximate value of one of the electronic systems was $20,000.00; that Ellis was at liberty to adjust his own working hours; that, on the day of the collision, Moxley was not aware that Ellis had left with the system; that he had authority to take it and deliver it to the Base; that the equipment was to be delivered to the Astronics Laboratory; that the Laboratory closed at 3:45 on the day of the collision; that Ellis did not have authority to take the device out of the office, keep it overnight, and deliver it the following morning; that AVCO had "a very definite policy" with respect to employees' taking out such equipment, keeping it overnight, and delivering it the next day; that, if Ellis had requested specific authority to do so, Moxley would have told him not to do it; that it was permissible for Ellis to

leave the office as early as 3:00 or 3:30 to go home or on some personal mission of his own; that the road, which Ellis took on the afternoon of the collision, was not the most direct or quickest route to the Laboratory; that Moxley would "presume" that Ellis left the office about 3:30 and that it would take longer than 15 minutes to get to the Laboratory.

The defendant, Ellis, testified that the police car arrived on the scene five minutes after the accident occurred; that he had an appointment with an acquaintance at one of the motels on the Parkway; that, after the accident, the Richardsons took him to the motel; that the man he was to meet had already left; that he had a piece of AVCO's equipment in his car and was planning to deliver it to the Laboratory the next morning; that he could not have gotten there on the day of the accident before the Laboratory closed at 3:45; that he "would have to guess" as to when he left the office and he "still guess(es) at 3:45."

Ellis testified further that he had been working for AVCO about six months when the accident occurred; that he was a staff engineer; that most engineers have "loosely controlled hours" for working; that they work a lot during "non-normal working hours" and actually put in more hours than a forty hour week; that he was sometimes put in charge of the office; that he had taken similar boxes to the Arsenal before; that Mr. Dolbeer knew that Ellis was taking the box; that he told Dolbeer that he was going to take the box home and deliver it the next day; that Dolbeer said "Okay"; that Ellis is not sure that he already had previous authority from Moxley; that Ellis did not have any specific instructions from Moxley about "that box" or "any other boxes that he took"; that Dolbeer "agreed to let me take it"; that Dolbeer had as much right to give Ellis that box as anybody there except Moxley; that Ellis does not recall "any specific instructions from Mr. Moxley about delivering those boxes"; that Ellis does not recall taking any similar box home before; that he had de-

livered them directly to the Arsenal; that Ellis had a duty to deliver that box.

Ellis testified further that he could pretty well keep his own hours; that very often he came back at night and worked; that he was on a straight salary and "wasn't on a time clock."

■ Responsibility of the master for acts of the servant does not arise simply from the circumstance that at the time of the injury the person inflicting it was in the employment of another. The act inflicting the injury must have been done in pursuance of authority either express or implied. It must be an act which is fairly incident to the employment, in other words, an act which the master has set in motion. The facts of each particular case must determine the question. Alabama Fuel & Iron Co. v. Powaski, 232 Ala. 66, 67, 166 So. 782.

■ The general rule of responsibility is that, if the act resulting in the injury complained of was within the scope of the servant's employment, the master will be liable therefor, although the act was in violation of the master's instructions as to the method of performing the work, or contrary to instructions, or expressly forbidden by him. St. Louis-San Francisco Ry. Co. v. Robbins, 219 Ala. 627, 629, 123 So. 12, ¶ [4].

In the instant case, there appears to be no contention by AVCO that Ellis, in taking the box to the Laboratory, was not doing an act which he had a duty and authority to do. AVCO's contention appears to be that Ellis was not acting within the scope of his employment because he was taking the box home overnight with the intention to deliver it the next morning instead of taking the box from the office directly to the Laboratory without intervening delay.

Moxley did testify that Ellis had no authority to take the box home overnight and that so doing would violate AVCO's policy; but, there is no testimony that Ellis had been informed of the policy or instructed not to take the box home overnight. Dol-

beer, an employee with authority next below Moxley, indicated that it would be "Okay" for Ellis to take the box overnight for delivery the next morning.

■ AVCO relies on the general rule that an employee using an automobile, whether belonging to his master or to himself, in going to and from his place of work, is not at such times regarded as engaged in work for his master but is acting solely for his own purposes. Smith v. Brown-Service Ins. Co., 250 Ala. 613, 615, 35 So.2d 490, ¶ [3]; Hill v. Decatur Ice & Coal Co., 219 Ala. 380, 122 So. 338.

■ The testimony is that Ellis had no fixed working hours and was not on a time clock. The evidence supports an inference that, in taking the box home for delivery the next morning, Ellis was engaged in the furtherance and accomplishment of his master's business and was doing an act which he had a duty and authority to do, although the time or procedure in which he was doing the act may have violated AVCO's policy of which Ellis had received no instructions, and, for aught that appears, of which he had no knowledge.

"Where the servant abandons his master's business for personal reasons, the employment is suspended, and the master is not liable for the negligence of the servant during the suspended employment and during the time of the servant's departure from the master's business. Each case must be governed of course by its own peculiar facts. Bell v. Martin, 241 Ala. 182, 1 So.2d 906, 908. In dealing with the question of the deviation of the servant from his master's business, this court in the case here cited quoted with approval from Ritchie v. Waller, · 63 Conn. 155, 28 A. 29, 27 L.R.A. 161, 38 Am.St.Rep. 361, the following:

"' '" 'In cases where the · deviation is slight and not unusual, the court may, and often will, as matter of law, determine that the servant was still executing his master's business. So, too, where the deviation is very marked and unusual,

the court in like manner may determine that the servant was not on the master's business at all, but on his own. Cases falling between these extremes will be regarded as involving merely a question of fact, to be left to the jury or other trier of such questions.' * * *"' " Engel v. Davis, 256 Ala. 661, 664, 57 So.2d 76, 79.

The instant case falls between the two extremes, and, whether Ellis, at the time and place of collision, was acting within the scope of his employment by AVCO was a question for the jury to determine. Charge 8 was refused without error.

### 2. Excessive Verdict.

Defendants argue that the court erred in overruling their motion for new trial on the ground that the verdict is excessive.

They say that the overwhelming weight of the testimony is to effect that plaintiff suffered, at most, a mild cervical strain and that none of the emotional or nervous disorders which she claims were in any way connected with the collision.

All the testimony pertaining to plaintiff's injuries has been read and carefully considered. The jury and trial court heard and saw the witnesses and we did not. The trial court has overruled the motion for new trial on ground of excessiveness.

■ When such is the case, this court is reluctant to substitute its judgment for that of the jury and trial court unless the amount is so excessive as to indicate passion, prejudice, corruption, or mistake on the part of the jury. Alabama Power Company v. Smith, 273 Ala. 509, 526, 142 So.2d 228, ¶¶ [24, 25], [26]. Accordingly, we hold that the court did not err in overruling the motion for new trial on ground that verdict is excessive.

### 3. Mistrial.

During the qualifying examination of jurors, after they had been asked whether they

were officers or policyholders of State Farm Mutual Automobile Insurance Company, counsel for plaintiff made the following statement:

"Now, I don't know who Avco is insured by. I don't know."

Defendants moved for mistrial. We have not found any ruling on the motion. The trial court did instruct the jury to disregard counsel's remark.

While plaintiff's counsel was cross-examining the defendant, Ellis, the following occurred:

"MRS. RICHARDSON: The Lord knows I'm hurt.

"MR. RICHARDSON: We object to the outburst on the part of the plaintiff and move for a mistrial.

"THE COURT: You will have to go on out unless you can be quiet. Unless you can be quiet—

"MRS. RICHARDSON: I'll be quiet.

"MR. RICHARDSON: If the Court please, we move for a mistrial.

"THE COURT: All right, gentlemen, disregard that and don't let it have anything to do with you in making your decision in the case. And I overrule the motion.

"MR. RICHARDSON: We except.

"MR. CONWELL: I apologize for my client."

The record shows the following:

"During the course of Mr. Conwell's closing argument to the jury on behalf of the plaintiff, the following occurred:

"MR. RICHARDSON: We object to that statement. I am not representing 'that big corporation, AVCO'.

"THE COURT: I sustain the objection.

"MR. RICHARDSON: And we move for a mistrial.

"THE COURT: Overruled. Gentlemen, don't let that have anything to do with your deliberations in the case under any circumstances.

"MR. RICHARDSON: We respectfully except.

"MR. CONWELL: I apologize."

Defendants assign for error the overruling of their motion for new trial on the grounds, severally and collectively, that the court erred in overruling their respective motions for mistrial on the three occasions above set out.

Plaintiff's counsel, twice, and plaintiff herself, once, acted wrongfully on the occasions mentioned. On each occasion, counsel for plaintiff apologized either for himself or his client.

Defendants say in brief:

". . . . The cumulative effect of the numerous improper remarks and actions staged for the benefit of the jury, many of which do not appear of record, was to so poison the minds of the jury as to render it impossible for them to return a fair and just verdict, based upon the lawful evidence presented."

■ It would be difficult for this court to reverse for something which does not appear in the record. The three instances above set out show improper conduct on the part of counsel or plaintiff, but we are not persuaded that, separately or collectively, the acts complained of required that the court grant a mistrial, or that the court erred in overruling the motion for new trial on the ground that a mistrial ought to have been granted.

*4. Newly Discovered Evidence.*

■ Defendants contend that the court erred in overruling Ground 23 of their motion for new trial wherein defendants allege that, since the trial and verdict, they have discovered new evidence, to wit:

1. That plaintiff's age is "substantially greater than she testified to in the trial."

2. That the children presently living with plaintiff and her husband are not the foster children of plaintiff as she testified but are her own children.

3. That plaintiff has a history of emotional instability dating far back prior to the accident which gave rise to this case, " . . . . and which prior history of emotional instability defendants allege is the cause of any injuries or damages plaintiff may have been suffering at the time of the trial of this cause, contrary to the testimony of plaintiff at the trial."

Defendants allege that they made diligent effort prior to trial but failed to find such evidence because of the untruthful answers which plaintiff made, concerning her names prior to her present marriage, when her deposition was taken prior to trial.

The record sets out excerpts from her deposition wherein she testified clearly and positively that her maiden name was "Douglas," "Cleolar Douglas"; that her father's name was "Louie Douglas" and her mother was "a Richey, Liddy Richey"; and that, prior to her marriage to her present husband, her only previous marriage had been to a man named "Krumholtz," who was killed in 1951 or 1952.

On the trial, plaintiff testified that her father's name was "Lewing Everage" and that her own maiden name was "Cleolar Everage." Plaintiff testified that her mother was "a Krumholtz." When confronted with her contradictory depositions, plaintiff testified that she had thought that the deposition question referred to her mother, and that on that day she was hurting bad and having head pains and does not remember all that she said.

On the trial plaintiff testified that she was 37 years old and had been born in Amarillo, Texas, March 9, 1929. The trial was on March 30, 1966.

On the trial, plaintiff testified that she had been married only one time before she married Richardson; that the name of her first husband was "Maynard Douglas"; that Mary Douglas is her foster daughter and is no relation to Maynard Douglas; that she, the plaintiff, has only one child of her own who is dead.

In support of the motion for new trial, defendants introduced into evidence a certified copy of a birth certificate showing that on December 8, 1943, a male child named "Franklin Sellers Douglas, Jr." was born in Houston, Texas; that the father was "Franklin Sellers Douglas" and the maiden name of the mother was "Cleo Edwards."

Defendants also introduced an affidavit made by Elmot Hortman in the State of Louisiana on May 26, 1966. He deposes that Oren Ford Richardson is the son of affiant's daughter; that affiant and his wife raised Oren in their home since he was seven months old; that four or five years ago Oren told affiant that he and Cleo had gotten married in Houston; that from Cleo's appearance, actions, and speech, affiant thought Cleo was approximately 40 years old at that time; that while affiant and wife were visiting Oren and Cleo in Dallas, affiant saw a hammer on a couch and Oren told affiant that Cleo had been trying to hit Oren with the hammer; that, later during the visit, Cleo began to attack Oren tearing his clothes and trying to cut him with a broken bottle; that on another occasion, affiant saw Cleo beating Oren with her purse; that affiant, when visiting Oren and Cleo, had seen four to seven children in the house and that Cleo had "explained 'her'" children as follows. She said that her first husband and child had been killed in an automobile wreck with another car; that in the other car were a man, a woman, and four children; that the man and woman were killed; that Cleo exchanged purses and identity with the dead woman and took and raised the four children.

Defendants also introduced an affidavit by Louise Hortman, wife of Elmot Hortman, affirming that his statements were true.

Defendants also introduced an affidavit by Louise Richardson who states that she is the mother of Oren Ford Richardson, Jr., the plaintiff's husband; that plaintiff never would let him be with affiant very much for affiant believes that plaintiff was afraid affiant would turn her son against plaintiff; that affiant worked with plaintiff in Dallas in 1959 and thought plaintiff was "crazy or on goof balls" since she was normal sometimes and crazy other times; that plaintiff has six natural children but has her husband convinced they are not plaintiff's children but are the children of a former husband of plaintiff.

Defendants also introduced an affidavit made by Rose Dowell who states that she is the mother of Linda Wilson who married Franklin Sellars Douglas in Dallas County Texas; that it is my understanding "that he was one of six natural children of Cleo Douglas Richardson."

Defendants introduced also the affidavit of the husband of Rose Dowell who swears that he has an "understanding" which is substantially the same as that of his wife.

The tendency of defendants' newly discovered evidence is to prove that plaintiff testified falsely as to the number of children she has had and as to her age. Affiants are all laymen. None of them is shown to be qualified to testify as to plaintiff's prior physical or nervous condition.

Nothing in the newly discovered evidence has any tendency to show that another trial would probably result in a verdict in favor of either one of the defendants and against the plaintiff.

In McCormack Bros. Motor Car Co. v. Arnold, 223 Ala. 504, 137 So. 288, this court affirmed a judgment granting a new trial on the ground of newly discovered evidence. The original trial had resulted in a verdict for defendant on account of written instructions given by the court to the jury. This court stated that to justify the granting of a new trial, new discovered evidence ". . . . must render probable a different result." The court said further, in effect, that if the newly discovered evidence had been available on the trial, "Certainly the affirmative charge would not have been given for defendant, and to that extent a different result would follow." (223 Ala. at 507, 137 So. at 289–290) Such is not the situation in the case at bar. Here the newly discovered evidence has no relation to plaintiff's right to recover and could only affect the amount of the verdict.

In Brown v. Standard Casket Mfg. Co., 234 Ala. 512, 175 So. 358, this court reversed for overruling plaintiff's motion for new trial on ground of newly discovered evidence in a case where the court gave the general charge for a corporate defendant. This court said that the new evidence was not merely cumulative or impeaching and on another trial may be productive of a different result. 234 Ala. at 518, 175 So. 358.

In Ohme v. Bisimanis, 222 Ala. 262, 132 So. 161, this court reversed a judgment overruling defendant's motion for new trial on the ground of newly discovered evidence. Plaintiff claimed that he had suffered a double hernia from being hit by the automobile of defendant. Plaintiff was apparently a pedestrian. On the main trial the evidence was in sharp conflict as to whether the car actually came into contact with the body of the plaintiff. The newly discovered evidence was stipulated to be that a physician would testify that his records showed he had examined plaintiff several months prior to the date of the alleged injury and that plaintiff was suffering from a double hernia on the date of the examination.

Here, the newly discovered evidence is that of laymen and has no tendency to show that plaintiff was suffering from any physical impairment prior to the collision.

"New trials for newly discovered evidence, not material on the main issues but only on the measure of unliquidated

damages may be, and frequently have been, refused; but, on the other hand, they have also been granted because of the discovery of such evidence. Proposed evidence to reduce the amount of the recovery only must be of so convincing a character that, had it been offered at the trial, the verdict would be clearly excessive, and a new trial is sometimes granted instead of providing for a reduction of the verdict." 66 C.J.S. New Trial § 111, p. 317.

The newly discovered evidence in the instant case does not appear to be so convincing that, had it been offered on the trial, the verdict would be clearly excessive. Overruling Ground 23 of the motion for new trial was not error.

Error not being shown, the judgment is affirmed.

Affirmed.

LIVINGSTON, C. J., and SIMPSON, BLOODWORTH and McCALL, JJ., concur.