Sherrea Hendley appeals from a partial summary judgment holding that, at all pertinent times, defendant Jack Sands was not an agent of either of the movants, but, rather, was an independent contractor. On December 1, 1989, the circuit court heard the arguments and considered the briefs and supporting evidentiary materials filed by the parties. The circuit court granted a partial summary judgment in favor of Springhill Memorial Hospital ("Springhill") and West Mobile Therapy Associates ("West Mobile"). The court's well-reasoned opinion stated, in part:
 ". . . [The court] finds that at all pertinent times, the Defendant Sands was not an agent of either of the Movants, but rather was an independent contractor. Moreover, even if Sands did have an agency relationship with either of the Movants, the sexual assault alleged, by *Page 549 
its very nature, was not an act which was fairly incident to the relationship, nor was it in promotion of Sands' duties. Rather, the act alleged was wholly aside from the business of either the hospital or of the therapy group, was not done in promotion of the business of either, and the alleged act, if committed, was done on Sands' own behalf and not pursuant to his duties with either of the Movants. The Court therefore concludes that with respect to the allegations in Plaintiff's First Cause of Action based on a theory of vicarious liability for the acts of the Defendant Jack Sands, that there is no genuine issue of any material fact and that the Movants are therefore entitled to judgment as a matter of law.
 "It is thereby ORDERED, ADJUDGED, and DECREED that the Summary Judgment Motion of the Defendants Springhill Memorial Hospital and West Mobile Therapy Associates be and [it] is hereby GRANTED, in part, dismissing all claims against Springhill Memorial Hospital and West Mobile Therapy Associates based on vicarious liability for the acts alleged to have been committed by the Defendant Sands."
We affirm.
Hendley alleged that Sands represented himself as an agent of Springhill and performed an unauthorized vaginal examination on her. Sands was a vendor of "TENS" units through his company, Electro-Med, Inc. TENS units provide pain relief to patients by delivering electrical stimulation through electrodes attached to indicated areas of the body. Whenever a TENS unit was prescribed, Sands would make rounds to establish if the unit was functioning properly by checking the battery strength and modality settings. If a patient indicated that a unit was not providing proper relief, Sands would make the necessary adjustments to the unit or replace the electrodes. In order for a patient to be eligible for a TENS unit treatment, a doctor had to make a recommendation to the physical therapy department. In order for Springhill to provide this service, a contractual agreement was entered between Springhill and West Mobile that gave West Mobile the exclusive right to provide physical therapy services at Springhill. An additional provision in the contract required West Mobile to maintain a listing in the telephone book that read "Physical Therapy Department" of Springhill. On a daily basis, a report of billings generated as a result of physical therapy provided by West Mobile was submitted to Springhill. West Mobile was then paid a flat rate of 40% of the submitted figure. Springhill provided the space for West Mobile in the hospital and on the door was a sign reading "Physical Therapy Department." Sands, as the sole provider of TENS units, billed the hospital on a one-time flat fee each time a patient was given a TENS unit treatment. This charge was then passed on to the patient as part of his or her overall bill.
There was no written employment contract between Sands and Springhill or Sands and West Mobile. No personnel file on Sands existed at either the hospital or at West Mobile's place of business, and while in the hospital Sands usually appeared in a business suit with no form of identification. Whenever a physician prescribed a TENS unit treatment, Sands would bill the hospital directly for service rendered and equipment supplied, at a flat per-use fee of $59.30.
On a normal day, Sands would go into the physical therapy department and check the in-patient board to see who was equipped with or was in need of a unit. Sands's equipment was stored in a file cabinet located in the physical therapy department. Sands testified that he was obligated to have a nurse accompany him into the room of a female patient and to be supervised for the duration of the visit. Sands was to approach the nurse's station and inform the nurses that he was going into the room and would be in need of an escort.
Hendley was admitted to Springhill as an in-patient in January 1988. Because of the pain Hendley was experiencing in her coccyx (tailbone), her physician prescribed a TENS unit treatment. On January 23, 1988, Sands entered Hendley's room to check on the unit, only to discover that the *Page 550 
unit was not functioning properly. There is conflicting testimony as to what subsequently transpired. Hendley testified as follows:
 "So, he was fixing it, the batteries, whatever, and the next thing I know he asked me if it hurt while I had sex, and I told him sometimes. . . . He went in the bathroom and washed his hands and then he came back out and he pulled down the covers and he gave me an exam and he said does this hurt? And I said no, not really. And he said does this hurt? And I said no, not really, and he did it a couple of more times and then he was through and he went back and washed his hands again. He stood there and talked to me for maybe three or four more minutes and then he left."
Sands denied that any unauthorized vaginal touching occurred. Later on in the day, Hendley started getting suspicious about Sands's activities and began to question the hospital personnel. After realizing that it was an unauthorized exam, she informed the hospital of the incident. She notified her husband of the alleged incident and he contacted the police.
Two issues are presented on appeal: (1) whether the trial judge erred by ruling, as a matter of law, that no agency relationship existed between Sands, West Mobile, and Springhill, and (2) whether the trial court erred by ruling, as a matter of law, that, even assuming an agency relationship, the actions of Sands were outside the line and scope of his employment.
 I.
With respect to the first issue, we pretermit any discussion, because, even if an agency relationship existed between the parties, the alleged act would have been such a deviation from the line and scope of employment as to render Springhill and West Mobile not liable.
 II.
To recover against a defendant under the theory of respondeat superior, it is necessary for the plaintiff to establish the status of employer and employee — master and servant — and toestablish that the act was done within the scope of theemployee's employment. Wells v. Henderson Land Lumber Co.,200 Ala. 262, 76 So. 28 (1917). Thus, the determinative question becomes whether the act committed by the employee was done while acting within the line and scope of his employment. If it is determined that the employee was not acting within the scope of his employment, then there can be no recovery under the doctrine of respondeat superior.
It is a general rule that where an employee abandons his employer's business for personal reasons the employment is suspended and the employer is not liable for the actions of the employee during the temporary lapse in employment and during the time of the employee's absence from the employer's business. Land v. Shaffer Trucking, Inc., 290 Ala. 243,275 So.2d 671 (1973). A tort committed by an agent, even if committed while engaged in the employment of the principal, is not attributable to the principal if it emanated from wholly personal motives of the agent and was committed to gratify wholly personal objectives or desires of the agent. Plaisancev. Yelder, 408 So.2d 136 (Ala.Civ.App. 1981). If there is any evidence in the record tending to show directly, or by reasonable inference, that the tortious conduct of the employee was committed while the employee was performing duties assigned to him, then it becomes a question for the jury to determine whether the employee was acting from personal motives having no relationship to the business of the employer. Plaisance,408 So.2d at 137. However, in Avco Corp. v. Richardson, 285 Ala. 538, 234 So.2d 556 (1970), this Court noted that in cases where a servant's deviation from the master's business is slight and not unusual, a court may determine, as a matter of law, that the servant was still executing the master's business. On the other hand, with a very "marked and unusual" deviation, the court may determine that the servant is not on his master's business at all. Cases falling between these two extremes must be regarded as involving a question of fact to be left to the jury. In this case, *Page 551 
Sands, if he committed the alleged vaginal examination, "acted from wholly personal motives having no relation to the business." Plaisance, 408 So.2d at 137. Furthermore, such a deviation from his duties necessarily would have been "marked and unusual."
In Great Atlantic Pacific Tea Co. v. Lantrip, 26 Ala. App. 79,153 So. 296 (1934), the Alabama Court of Appeals held that a sexual advance made by a store clerk while waiting on the plaintiff was "entirely personal . . . and was wholly aside from the master's business," even though the act was done during the employment of the employee by the defendant. Alabama jurisprudence is consistent with federal jurisprudence. InGrimes v. B.F. Saul Co., 60 App.D.C. 47, 47 F.2d 409 (1931), the court held that a defendant corporation could not be held liable for a rape committed upon a tenant of an apartment building owned by the corporation where the rape was committed while the defendant employee was making certain inspections of the building. The court concluded that the employee's act was "an independent trespass of the agent, utterly without relation to the service which he was employed to render for the defendant." Id., 60 App. D.C. at 48, 47 F.2d at 410. The Court reasoned as follows:
 "The act of a servant done to effect some independent purpose of his own and not with reference to the service to which he is employed, or while he is acting as his own master for the time being, is not within the scope of his employment so as to render the master liable therefor. . . . The moment the agent turns aside from the business of the principal and commits an independent trespass, the principal is not liable. The agent is not then acting within the scope of his authority in the business of the principal, but in the furtherance of his own act. . . . The general idea is that the employee at the time of doing the wrongful act, in order to fix the liability on the employer, must have been acting in behalf of the latter and not on his own account."
The alleged examination is such a gross deviation from the purpose for which Sands was in Hendley's room (monitoring her TENS unit), that the conduct cannot be attributed to Springhill or West Mobile by application of the doctrine of respondeat superior. Accordingly, the partial summary judgment in favor of Springhill and West Mobile must be affirmed.
AFFIRMED.
MADDOX, ALMON and STEAGALL, JJ., concur.
HORNSBY, C.J., concurs in the result.