Shades Ridge Holding Company, Inc., plaintiff below, appeals from final judgment entered after an ore tenus trial in favor of defendant below, Mortgage Corporation of the South (formerly known as Cobbs, Allen Hall Mortgage Company, Inc.). *Page 603 
In this action Shades Ridge Holding Company, Inc. (hereafter Shades Ridge) sought damages resulting from its loss of approximately 19 acres of land in Vestavia Hills, Alabama. Shades Ridge leased its land to Joseph Sandner who ostensibly was to be the owner of two apartment projects to be constructed on the land. Sandner was not, however, the sole owner of the projects. Instead, Jack Harrison had an undisclosed partnership interest in one of the projects and held the other in trust for the children of Dan Haralson. Haralson during this time was an officer of Mortgage Corporation of the South, Inc. (hereafter South). South, a mortgage loan broker, secured both construction and long-term financing for the apartment projects to be constructed on Shades Ridge's land.
Shades Ridge's land was pledged as security for both the construction loans and long-term loans for the apartment projects, with no personal liability upon the part of Sandner or anyone else.
Substantial amounts of money from the proceeds of the construction loans were misapplied and paid to, or for the benefit of Sandner, Harrison, and Haralson, or entities in which they had an interest.
Thereafter, Shades Ridge lost its property when the loan repayments went into default and the mortgages on the apartment projects were foreclosed.
 The Case
Shades Ridge filed a total of thirteen counts in an amended complaint seeking damages because of causes of action arising out of transactions associated with the construction and financing of apartment projects on Shades Ridge's land. For purposes of this appeal we need not elaborate upon Shades Ridge's claims against other defendants below than Mortgage Corporation of the South. Shades Ridge's claims against South are found in the following counts of the complaint as amended: (1) count one alleging fraudulent misrepresentation; (2) count two alleging interference with contractual relations between Shades Ridge and Sandner; (3) count three alleging that South breached a contract between it and certain mortgage lenders and that Shades Ridge was entitled to recover for that breach as a third party beneficiary to the contract; (4) count four alleging fraud on South by its agent Haralson for which Shades Ridge was entitled to recover; (5) count five alleging breach of a provision in a mortgage contract whereby the mortgagee covenanted to notify Shades Ridge in the event of certain defaults upon the part of Sandner which in fact occurred and of which South was required to give notice to Shades Ridge; (6) count ten alleging South's breach of a fiduciary duty and of a duty to disclose; (7) count eleven alleging that South aided and abetted Sandner in his breach of a fiduciary duty; (8) count twelve alleging that a long-term mortgage on a portion of Shades Ridge's property was void because it was executed by Shades Ridge's officers containing terms not authorized by resolution of the board of directors of Shades Ridge; (9) count thirteen alleging fraudulent misrepresentations and nondisclosures upon the part of South. The latter count was added by amendment during trial.
Before trial on the merits the trial court rendered summary judgments in behalf of South as to counts three, five, ten, and twelve of Shades Ridge's complaint. As to those counts Shades Ridge asserts that entry of those summary judgments is reversible error.
Count five charges that the provisions of a mortgage placed upon South an obligation to notify Shades Ridge if the terms of the ground lease between Sandner and Shades Ridge were breached. Shades Ridge charges that South breached this contractual obligation by failing to monitor the ground lease and by not notifying Shades Ridge of certain violations that occurred.
Count ten charges South with a breach of fiduciary duty, or duty to disclose material facts arising from particular circumstances, owed Shades Ridge. Shades Ridge alleges it employed South as a mortgage broker to secure mortgage loans for the apartment projects to be located on Shades Ridge's land pursuant to the ground lease with *Page 604 
Sandner. South, Shades Ridge alleges, breached this duty by its acts adverse to the interests of Shades Ridge in that an executive officer of South, Haralson, held an equity interest in one of the projects and made secret profits from the proceeds of the mortgage loans at Shades Ridge's expense. Moreover, South failed to communicate these material facts to Shades Ridge.
Count twelve alleges that Shades Ridge joined in the execution of a mortgage to South on an apartment project located on a tract of Shades Ridge's property that secured Sandner's note for $2.3 million bearing interest at the rate of 8 3/4% per annum. South later transferred that note and mortgage to First Federal Savings and Loan of Miami which foreclosed on the mortgage and thereby acquired title to that tract previously owned by Shades Ridge. Shades Ridge alleges that the mortgage is void and of no effect because it was executed without proper authority because the board of directors resolution authorized execution of a mortgage securing a note at 8 1/2% per annum and not 8 3/4%.
The case proceeded to trial on counts one, two, four, and eleven. Count thirteen, added during trial, in essence restated claims for fraudulent misrepresentation and nondisclosure which were already the subject of other counts. The claims against South which were tried were based on: (1) its aiding and abetting Sandner in violating a fiduciary obligation he owed Shades Ridge; and (2) South's participation with Sandner in some of his fraudulent conduct as outlined in counts one, two, four, and eleven. The latter counts delineate various acts which are the bases of Shades Ridge's charges of fraud. The claims can be summarized to state: (1) that Sandner was the ostensible owner of the two apartment project buildings on Shades' land but that Jack Harrison had a secret partnership interest in one project and secretly held an interest in the other as trustee for Dan Haralson's children; (2) that substantial amounts from the proceeds of the construction loans obtained for the construction of the projects were misapplied and paid to or for the benefit of Sandner, Harrison, and Haralson, or entities in which they had interests; and (3) that as a result of the various frauds practiced by Sandner, South, and others, construction of the apartment projects was delayed, they were of inferior quality, the apartments were made more difficult to rent, and major repairs were required, resulting in foreclosure of the mortgages against the projects and the loss by Shades Ridge of its property. South was charged with vicarious responsibility for Haralson's conduct because he was its executive vice-president.
The trial court found and ordered as follows: (1) there was no fiduciary relationship between Sandner and Shades Ridge in connection with the projects, but, (2) there was a confidential relationship between Sandner and Shades Ridge concerning Sandner's use and application of the proceeds of the construction loans; (3) after an initial default in the ground lease Sandner agreed to assign his interest in both projects to Vestavia Park Company but obligated himself to remain responsible for performance under the terms of the ground lease for one year after the assignment; (4) because certain terms of the lease were not performed for the one year period judgment is entered against Sandner for $20,834 plus interest; (5) by consenting to and executing the assignment Shades Ridge released Sandner from contractual liability based on his failure to account to Shades Ridge with respect to the proceeds of the construction loans; (6) the diversion of the proceeds of the construction loans and the concealment or failure to disclose the same to Shades Ridge operated as a fraud on Shades Ridge; (7) South was guilty of fraud because when Haralson received and diverted part of the funds he was South's executive vice-president and it had placed him in a position where he was able to engage in the fraudulent conduct; and, (8) the fraudulent conduct was the cause of Shades Ridge's damages; therefore, judgment is rendered in South's favor.
On this appeal Shades Ridge complains of error in the final judgment by the trial court's misapplication of the law to the *Page 605 
facts and by entry of partial summary judgments denying its right to proceed on the theories stated in counts five, ten, and twelve.
 Facts The Property
In August of 1970 Shades Ridge owned nineteen acres of land in the City of Vestavia Hills, in Jefferson County, separated by the Old Montgomery Highway so that one tract, lot 16-A contained approximately fourteen acres and the other tract, lot 12-A, contained approximately five acres. Both tracts were at that time zoned for single family residences. Shades Ridge's attempt to have the property rezoned for a shopping center had failed.
 The Negotiations
Charles L. Denaburg (an attorney representing Shades Ridge) and Jack Harrison (an attorney representing Sandner) discussed developing apartment projects on the land. This would necessitate a rezoning of the property. Denaburg negotiated with Harrison regarding terms of a ground lease to Joseph C. Sandner who was to be the developer of apartments to be constructed on the property. Harrison ostensibly was only acting in the capacity of an attorney representing Sandner; however, both he and Daniel B. Haralson, the executive vice-president of South, were to have interests in the apartments to be built on Shades Ridge's property. Shades Ridge was not apprised of any interests in the projects other than Sandner's.
Denaburg, Sandner, Harrison, Haralson, and Pete Thomas, secretary of Shades Ridge, attended a meeting in Denaburg's office where it was understood that Sandner was to be the builder, Harrison would get the zoning changed, and Haralson would arrange financing.
On 16 November 1970, Harrison persuaded Vestavia Hills to rezone the property in order to permit construction of apartments on it.
On 22 February 1971, South, through Haralson, arranged for the permanent financing of the projects. New York Life Insurance Company made a commitment for a permanent loan of 2.1 million dollars to finance a 170-unit apartment project on the 14-acre tract, but declined to make a loan commitment for development of the other. As a consequence, the development of the two tracts of land was treated as separate projects. South then procured a permanent loan commitment from State Mutual Investors in the sum of $637,500 to finance a 50-unit apartment project on the five-acre tract.
The latter loan commitment was initially issued to and accepted by Jack Harrison as trustee under a trust indenture established by Haralson on 18 December 1970 for the benefit of his wife and children. By letter dated 11 January 1971, addressed to Harrison, Sandner agreed to convey the 50-unit project and a 57 1/2% interest in the 170-unit project to Harrison by warranty deed. Shades Ridge had no knowledge of Harrison's interest or that of the Haralson trust. Haralson, by letter to Charles Speir dated 9 March 1971, asked State Mutual Investors to assign the commitment to Sandner "to facilitate matters and to allow construction to proceed."
Exchange Security Bank agreed to be the lead lender for the construction loans for the two projects. State Mutual Investors, because it had made a permanent loan commitment on the 50-unit project, agreed to purchase the note and mortgage evidencing the construction loan on this project and then convert it to a permanent loan.
On 1 April 1971, Sandner entered into a written contract with Bruce MacClary and James C. Barton, d/b/a MacClary Contracting Company, for the construction of the two apartment projects. MacClary agreed to build the 170-unit complex for $1,650,000 and the 50-unit project for $550,000.
 The Transaction
On 2 April 1971, after lengthy negotiations between Denaburg and Harrison, Shades Ridge executed a ground lease to Sandner covering both parcels of the aggregate nineteen acres. Thereupon, the construction loans were closed. Sandner *Page 606 
agreed to construct apartments on each of the tracts of land and Shades Ridge agreed to execute a mortgage on its land to enable Sandner to obtain financing for those apartment projects. Shades Ridge's land and the apartments to be located thereon were to be the only security for both the construction loans and the permanent loans. Neither Sandner nor Shades Ridge were to incur personal liability. The ground lease was for a term of thirty years with minimum annual rental payments of $25,000 plus a percentage of profits, payable in monthly installments. Rental payments for the final six years of the term of the lease, amounting to $150,000, were payable in advance. Also, Sandner was required to pay as advance rents any amount in excess of $75,000 by which the permanent loans exceeded the cost of development.
 The Diversions Beginning with the first draw on the construction loans, Sandner and Haralson began diverting substantial sums from the proceeds. These sums were treated as payments for services or materials furnished by Sandner or by corporations owned by Sandner and Haralson.
Unknown to Shades Ridge, Sandner formed a corporation called Horizon Development Services, Inc., to prepare the plans and specifications for the construction of the apartment buildings and also furnish other necessary architectural services. Haralson, or the trust for his wife and children, owned 25% of this corporation. Ed Bailey, the architect hired by Horizon to design the apartment projects, also had an interest in this corporation. Payments totaling $45,000 for architectural services ostensibly meant for Bailey were in fact paid to Horizon.
Another corporation, Developers Services, Inc., in which Sandner owned an interest, and Harrison as trustee under the trust for the benefit of Haralson's wife and children owned a 25% interest, sold carpets and drapes to the apartment projects. The carpet was of such inferior quality that it had to be replaced prior to being used. This carpet cost significantly less than the amount allocated for carpet; the difference in the amount expended and that allocated was diverted to Developers Services, Inc.
Other sums misapplied from the apartment projects construction loan proceeds included: $45,105 paid to Bruce MacClary, Sandner's contractor for the project, for construction work and materials supplied to one of Sandner's other projects, LePappillon Apartments; $5000 to M L Investment Company, another of Sandner's companies; $24,000 to Harrison, trustee; $20,100 to Horizon Properties; and $7000 to Horizon Inns and Management, another Sandner Company.
Following the usual procedures, MacClary made monthly requests for payments indicating with each request the percentage of the construction contract which had been completed. Ed Bailey, the architect, approved these requests and Sandner paid them from construction loan proceeds.
In June 1972, it came to the attention of one of the banks involved that the amounts paid to the contractor exceeded by 16% the progress of the work performed. In September 1972, an agreement was reached authorizing further payments to MacClary in exchange for MacClary's promise to complete the 170-unit project by 30 November 1972.
MacClary filed suit in November 1972 claiming that construction was complete. The case was settled in September 1973. Prior to that time, however, it came to Shades Ridge's attention that numerous deficiencies existed in the 170-unit project. These included incomplete landscaping and cleanup, leaks in the roofs in many units which caused extensive damage to ceilings, wood balconies out of plumb, and other deficiencies.
In an agreement between Shades Ridge and Sandner, Sandner agreed to complete the units and to make certain repairs and refurbishings.
 The Bailout
Following closing of the permanent loan on the 170-unit project Sandner defaulted in making the monthly payments due First *Page 607 
Federal Savings and Loan Association of Miami and it refused to grant a moratorium on those mortgage payments.
Thereafter, Sandner executed an assignment transferring all of his interest in the ground lease covering both the 170-unit project and the 50-unit project to a partnership of which Shades Ridge was a partner. Sandner was to remain liable under the lease for a year thereafter. However, as a result of defaults in mortgage payments due on each of the projects the mortgages on both projects were foreclosed and Shades Ridge lost its land.
 Controlling Principles of Law
There are two fundamental controlling principles of law applicable in this case to resolve the issues presented. First, in cases of intentional or aggravated acts there is an extended liability and the rules of proximate causation are more liberally applied than would be justified in negligence cases. This is especially true in cases of fraud where proximate cause is often articulated as a requirement of reasonable reliance where but for the misrepresentation or concealment it is likely the plaintiff would not have acted in the transaction in question. In those instances where the defendant is found to have acted intentionally it is proper that a more remote causation result in liability than would be true in negligence cases. The policy to be followed is that liability should fall on the wrongdoer rather than to permit the victim to go uncompensated.
Second, on motion for summary judgment, the initial burden of proving nonexistence of a genuine issue as to a material fact is on the movant. Until the moving party meets this burden the other party need not respond. Even if the movant meets his initial burden the opposing party is only required to producesome evidence in order to advance to trial.
 Issue One
Did the trial court improperly and erroneously apply the law to the facts in this case when it held that Haralson's and therefore South's fraud was not the proximate cause of Shades Ridge's losses and damages? We hold that it did and reverse.
 The Trial Court's Findings
The trial court expressly found that from the inception of the transactions under scrutiny on this appeal Sandner and Haralson contemplated that Haralson, either personally or through the family trust, would have the entire ownership interest in one of the projects and would also receive, by virtue of interests in corporations controlled by Sandner, a share of the profits made from the sale of materials and services to the projects. Haralson was aware of these diversions of monies and participated in the frauds while executive vice-president of South.
The trial court further found that Haralson acted adversely to the interests of South when he caused a loan brokerage fee of South's to be refunded to Sandner and therefore South could not be liable to Shades Ridge for that particular misconduct. However, Haralson's services in arranging the financing were within the normal course of his employment with South which is liable for fraud growing out of such circumstances where South placed Haralson in a position whereby he was enabled to engage in the fraudulent conduct.
The trial court concluded that the diversion of the construction loan proceeds by Sandner and South and the concealment or failure to disclose this activity to Shades Ridge operated as a fraud on Shades Ridge. Regarding certain defects in construction and delays in completion that Shades Ridge complained of, the court found Sandner and South had not acted fraudulently to bring about those delays or defects with the exception of the defective carpet that was installed by one of Sandner's and Haralson's corporations. On the crucial issue of proximate causation, however, the court was unable to conclude that either the diversion of substantial parts of the construction loans proceeds or the installation of the defective carpeting caused the failure of the two projects and the resultant foreclosure of the mortgages and loss of Shades Ridge's real property. *Page 608 
In the trial court's lengthy discussion of the proximate cause issue it cited only one case for the meaning and application of this complex doctrine. That case, City of Mobilev. Havard, 289 Ala. 532, 268 So.2d 805 (1972), was a negligence case. Therefore, at issue here is whether by relying solely on this negligence case the trial court considered the proper factors in their appropriate light in concluding that the fraudulent acts of Sandner and South were not the proximate cause of Shades Ridge's damages.
South contends it is not charged with an intentional tort. This contention lacks merit. Although the trial court's determinations were made on the basis of § 6-5-102, Code 1975, it made express findings of fact regarding Haralson's knowledge of the concealed facts and his contemplation from the outset of having an interest in the projects and certain corporations in which he had an interest selling goods or services to the projects.
This court, in Chapman v. Rivers Construction Co., 284 Ala. 633, 227 So.2d 403, 410 (1969), discussed § 6-5-102, Code 1975, as it appeared identically in the previous code:
"Title 7, § 109, Code 1940, recites:
 "`Suppression of a material fact, which the party is under an obligation to communicate, constitutes fraud. The obligation to communicate may arise from the confidential relations of the parties, or from the particular circumstances of the case.'
 "§ 109 is declaratory of the common law. In dealings between persons standing in confidential relations, the law imposes an obligation on one party to safeguard the interests of the other party with the same fidelity with which he safeguards his own. Withholding facts, material to be known, is a breach of such legal duty, regardless of intent to deceive, and is a legal fraud. When the circumstances of the particular case impose a like duty, the same rule obtains. So reads the statute. In the absence of confidential relations, or special circumstances imposing a like duty, the rule seems settled that nondisclosure of facts to be fraudulent must be for purposes of deceit, Metropolitan Life Ins. Co. v. James, 238 Ala. 337, 341 [1, 2] [3], 191 So. 352."
In Metropolitan Life Ins. Co. v. James, 238 Ala. 337,191 So. 352 (1939), the court discussed the requirement of intent for actionable concealment or suppression in the absence of confidential relations or special circumstances imposing a like duty to disclose:
 "In Jordan Sons v. Pickett, 78 Ala. 331, dealing with fraud on the part of a seller of property, it was said: `Concealment implies design, or purpose. * * * The concealment must be for the purpose of continuing a false impression or delusion under which the purchaser has fallen, or of suppressing inquiry, and thereby effecting a sale-with the intention to conceal or suppress-and it must operate an inducement to the contract.'
 "And in Southern Land Development Co. v. Mever, 230 Ala. 40, 159 So. 245, 246, we find: `The suppression of the truth as to the material fact may amount to an actionable falsehood, as when, with the intent to deceive, a party to the contract conceals or suppresses a material fact which good faith requires to be declared or disclosed, it is the equivalent of false misrepresentation and fraudulent concealment (American-Traders' Nat. Bank et al. v. Henderson, 222 Ala. 426, 133 So. 36; Griel v. Lomax, 89 Ala. 420, 6 So. 741).'
 "In Restatement of the Law of Contracts, § 471, fraud is defined to include: `(c) non-disclosure where it is not privileged, by any person intending or expecting thereby to cause a mistake by another to exist or to continue, in order to induce the latter to enter into or refrain from entering into a transaction.' See Alabama Annotations to § 471."
On the basis of the foregoing analysis, and the trial court's findings of fact, it seems clear that Shades Ridge's claim was based on an intentional tort. We must therefore determine whether the considerations *Page 609 
which show proximate cause are identical in cases of negligent and intentional torts. A leading case recognizing and discussing the existence of both negligent and intentional misrepresentation is Ultramares Corporation v. Touche, 255 N.Y. 170,174 N.E. 441 (1931). In that case, on the same set of facts here present, liability on the basis of negligent misrepresentation was not allowed but the trial court was reversed for disallowance of the claim for intentional misrepresentation and that claim was remanded for trial.
There are numerous cases containing in depth discussions of proximate cause in the negligence context. In the context of fraud or other intentional torts the cases mention proximate cause as a necessary element for liability rather casually but provide little or no guidance regarding standards for determining causation. Often, courts do not even use the word "proximate" in connection with causation. For example, inMaring-Crawford Motor Co., Inc. v. Smith, 285 Ala. 477, 481,233 So.2d 484, 487 (1970), this court obliquely referred to causation: "* * * the good faith of a party in making what proves to be material misrepresentation is immaterial if the other party acted on such misrepresentation to his injury."
(Emphasis added.) And in Hall Motor Co. v. Furman, 285 Ala. 499,504, 234 So.2d 37, 41 (1970), speaking in terms of reliance on the intentional misrepresentation, this court held that "* * * punitive damages could be recovered * * * if * * * the evidence established that the material misrepresentation * * * was relied on by the injured party * * *." Similarly, inOates v. Glover, 228 Ala. 656, 658, 154 So. 786, 787 (1934), the court stated that "* * * it would follow that if the plaintiff did sustain actual damages, as the result of fraud * * *, the plaintiff would at least be entitled to recover nominal damages." (Emphasis ours.)
There is occasionally, however, an explicit recognition that the meaning and effect of "proximate cause" changes in relation to the context in which a case is brought. For example, inOlympic Towing Corp. v. Nobel Towing Co., 419 F.2d 230 (5th Cir. 1969), cert. denied, 397 U.S. 989, 90 S.Ct. 1120,25 L.Ed.2d 396 (1970), the court defined "proximate cause" in the admiralty context and distinguished it from the principle generally described in the common law. In another context the Texas Court of Appeals stated "* * * the term `proximate cause' as supplied in insurance cases has essentially the same meaning as in negligence cases except that in insurance cases the element of foreseeability * * * is not required." FederalInsurance Co. v. Bock, 382 S.W.2d 305 (Tex.Civ.App. 1964). Dean Prosser addresses this issue squarely. In discussing the foreseeability requirement usually imposed on liability for negligent conduct he states:
 "One area in which it may be especially likely that the `foreseeability' limitation will be cast aside is that of intentional torts, as to which it has been said often enough that there is more extended liability." Prosser, Law of Torts (4th Ed. 1971), § 43 at p. 263.
This trend is dictated by the policy that liability even though potentially tremendous should be imposed on the wrongdoer rather than the victim be uncompensated. Hence, even very remote causation may be found where the defendant acted intentionally.
The Restatement (Second) of Torts § 435A (1966), also recognizes this distinction between causation in cases of intentional and negligent torts. It states that even though the consequences were unexpectable, with an intentional tort, the defendant is liable for it even though had he been negligent he would not be so liable.
There are a few cases which also address this issue directly: In Johnson v. Greer, 477 F.2d 101 (5th Cir. 1973), at pp. 106-107, the court stated:
 "* * * the courts have generally held that where the acts of a defendant constitute an intentional tort or reckless misconduct, as distinguished from mere negligence, the aggravated nature of his action is a matter which should be taken into account in determining whether there is a sufficient relationship between the wrong and plaintiff's harm to render *Page 610 
the actor liable. Specifically, the factors to be taken into account are the tort feasor's intention to commit a wrongful act, the degree of his moral wrong in so acting, and the seriousness of the harm intended."
This same view was expressed by the New Jersey Superior Court in a case of malicious prosecution. After discussing proximate cause at length the court stated:
 "A different matter is presented where intentional acts are involved and it is clear that the rules of causation are more liberally applied to hold a defendant responsible for the consequences of his acts. It is well settled that where the acts of a defendant constitute an intentional tort or reckless misconduct, as distinguished from mere negligence, the aggravated nature of his acts is a matter to be taken into account in determining whether there is a sufficient causal relation to plaintiff's harm to make the actor liable therefor. His intention to commit a wrongful act, the degree of his moral wrong in acting, and the seriousness of the harm, which he intended are important factors in determining whether he is liable for resulting unintended harm. In applying concepts of `foreseeability' and `proximate cause' in such cases there is more extended liability, and in a case involving such aggravated acts a fact finder may be permitted to find that the actor's conduct bears a sufficient causal relation to a plaintiff's harm so as to make him liable, although no such finding would be permissible if defendant's conduct were merely negligent. * * *" Seidel v. Greenberg, 108 N.J. Super. 248, 260 A.2d 863 (1969).
In that case the court went on to say: "Indeed, it appears likely that many of the limitations upon liability that are subsumed under the doctrine of `proximate cause', as usually expounded in negligence cases, do not apply to intentional torts."
The Mississippi Supreme Court has also recognized this distinction. In State ex rel. Richardson v. Edgeworth,214 So.2d 579, 587 (Miss. 1969), that court stated:
 "In short, the defendants' intentional conduct is a legal cause of harm to plaintiffs if their individual acts were substantial factors in bringing about the harm. * * * A higher degree of responsibility is imposed upon a wrongdoer whose conduct was intended to cause harm than upon one whose conduct was negligent. Lyons v. Zale Jewelry Co., 246 Miss. 139, 150 So.2d 154 (1963) * * *."
As previously stated, the trial court in this case relied solely on a negligence case to support its conclusion that Sandner and South (acting through Haralson), although guilty of intentionally and fraudulently converting large portions of the construction loan proceeds to their personal use, did not proximately cause Shades Ridge's losses. In light of the considerations discussed above we hold that the trial court erred in failing to consider this issue in the context of an intentional tort.
Regarding causation, Harper and James, The Law of Torts, § 7.13 (1956), puts it this way:
 "* * * The problem of legal or proximate causation is of little difficulty in view of the general rule that all intended consequences are proximate. Whether the defendant's misconduct has in fact caused plaintiff any damage at all, however, is frequently presented as a problem of `reliance' on the part of the plaintiff upon the misrepresentation.
 "To establish that a loss sustained in a business transaction was caused by the defendant's misrepresentation, it must appear that the plaintiff relied upon the misrepresentations, and to show reliance, it must appear that the plaintiff believed the representations to be true. If the plaintiff knew that the representations were false or if he was already in possession of knowledge and facts which the defendant fraudulently attempted to conceal, he can not complain that he has been misled to his damage by the defendant's attempted deception. `A reliance upon the representations of another person in respect to any fact necessarily implies a belief in the truth of the statement *Page 611 
thus made.' The idea of a person knowing a representation to be false and at the same time `relying' thereon is a contradiction in terms.
 "Again, if the misrepresentation on the part of the defendant pertained to a trivial or immaterial fact, it would ordinarily be clear that such misrepresentation did not induce the plaintiff's reliance. It is only a misrepresentation of a material fact that can be said to cause the loss. To determine whether or not a misrepresentation was actually relied upon, whether it was a cause in fact of the damage, the sine qua non rule is often applied. If the plaintiff would not have acted on the transaction in question but for the misrepresentation, such misrepresentation was an actual cause of his loss. If he would have adopted the same course irrespective of the misrepresentation and would have sustained the same degree of damages anyway, it can not be said that the misrepresentation caused any damage, and the defendant will not be liable therefor."
Conversely, if Shades Ridge would have adopted a different course but for the suppression of a material fact then logically it has relied on the misrepresentation and the resulting loss is due to that reliance. See Lovell v. Smith,232 Ala. 626, 169 So. 280 (1936); Jackson Co. v. Faulkner,55 Ala. App. 354, 315 So.2d 591 (1975).
According to Prosser "proximate cause" has two prongs: Causation in fact and proximity. As stated above, the first prong can properly be stated in terms of reliance in the context of intentional misrepresentation. It is the second prong, the requirement of proximity between the misconduct and the injury which presents the most difficulty. Prosser states that this requirement is merely the limitation which the courts have placed upon the actor's responsibility for the consequences of his conduct. Therefore, the existence of causation in fact having been established, the problem of proximate cause becomes one of public policy, justice, and fairness. Prosser puts it this way:
 "As a practical matter, legal responsibility must be limited to those causes which are so closely connected with the result and of such significance that the law is justified in imposing liability. Some boundary must be set to liability for the consequences of any act, upon the basis of some social idea of justice or policy.
 "This limitation is sometimes, although rather infrequently, one of the fact of causation. More often it is purely one of policy, of our more or less inadequately expressed ideas of what justice demands, or of administrative possibility and convenience, none of which have any connection with questions of causation at all." Prosser, Law of Torts (4th Ed. 1971) § 41.
What then are the policy considerations regarding actions in tort for fraud? As with other torts, three functions of imposing liability come immediately to mind: compensation, deterrence, and loss spreading. Since "cause" is used in different guises within different contexts of social and legal policies the practical definition of causation should change as the policy considerations change. Causal concepts should be used flexibly in order to serve adequately the underlying policy considerations regarding the various tort actions. The court in Seidel v. Greenberg, 108 N.J. Super. 248 at 267,260 A.2d 863 at 875 (1969), stated this proposition this way:
 "In the case of liability for intended or aggravated acts, * * * although it is clear that there is extended liability and the rules of proximate causation are more liberally applied to hold a defendant liable, there is even less articulation in the cases of any workable rule which may be applied by a trial court. See Prosser, op. cit., § 50, at 303. In such case the court can only seek to draw upon such precedents as are available, applying the rules of causation with greater liberality than would be justified in a conventional negligence case. Foreseeability, as such, is not the test. If, weighing the moral fault of a defendant and applying the rules of causation liberally, the consequences have *Page 612 
some reasonably close connection with defendant's conduct and the harm threatened, and in themselves, using hindsight, are not deemed preposterous or far-fetched, defendant should be held liable. Concepts of policy, fairness and justice are entitled to great weight."
For the reasons stated the trial court is reversed because of its misapplication of the law regarding proximate cause to the facts in this case.
 Issue Two
Did the trial court err to reversal by entering partial summary judgment on 12 July 1978 as to counts five, ten and twelve?
South contends the partial summary judgment on 12 July 1978 was not final as to Shades Ridge because after entry thereof the pleadings might still have been amended to conform to the evidence presented at trial. South contends that by failing to refile counts five, ten, and twelve, Shades Ridge waived any error arising from an adverse ruling based on that partial summary judgment. Entry of that partial summary judgment, South contends, was harmless error under Rule 61, ARCP.
The court in E.I. DuPont De Nemours and Co. v. United StatesCamo Corp., 19 F.R.D. 495, 498 (D.C. 1956), explained the function and effect of a partial summary judgment:
 "When a court enters a partial summary adjudication pursuant to Rule 56 (d), it does not render a final judgment, which is appealable, but only an order as to uncontroverted facts which being interlocutory, is subject to revision or modification and that the partial interlocutory summary adjudication is merely a pretrial determination that certain issues are considered established for the trial of the case, and is similar to the preliminary order under Rule 16, its purpose like that of a pretrial order being to expedite litigation."
However, a partial summary judgment is not without beneficial effect. Similar to a pretrial order, it is designed to control the subsequent course of action. Cf. Hardy v. Sawyer,352 So.2d 1104 (Ala. 1977); Watson v. McGee, 348 So.2d 461 (Ala. 1977) (effect of a pretrial order). Similarly, the trial court has discretion to exclude evidence not conforming to a partial summary judgment. Cf. Rodrigues v. Riley Industries, Inc.,507 F.2d 782 (1st Cir. 1974) (pretrial order).
To require appellant to challenge such a partial summary judgment at a later time during the course of the proceedings in order to preserve error would be to place a more onerous burden on it than the law requires. The availability of a procedure to amend the pleadings to conform to the evidence under Rule 15, ARCP, does not make entry of an erroneous partial summary judgment harmless error under Rule 61, ARCP.
We cannot conclude that the partial summary judgment in South's favor was harmless error where certain counts were precluded from trial based on that judgment. To require a party to offer to amend his pleadings to reincorporate such existing counts when some evidence relevant to the excised counts is introduced on the issues tried would unduly restrict review of orders of this kind. Furthermore, where the trial court has discretion to prohibit the introduction of evidence relative to an issue precluded by partial summary judgment that discretion might have the improper effect of precluding review of an erroneous partial summary judgment under the theories South advances.
It should be noted that an order granting or denying a partial summary judgment provides an opportunity for a trial court to, in effect, make a pretrial order to control and simplify the issues remaining to be litigated.
Rule 56 (d), ARCP, provides that:
 "* * * the court at the hearing of the motion, by examining the pleadings and the evidence before it and by interrogating counsel, shall if practicable ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted. *Page 613 
It shall thereupon make an order specifying the facts that appear without substantial controversy, including the extent to which the amount of damages or other relief is not in controversy, and directing such further proceedings in the action as are just. Upon the trial of the action the facts so specified shall be deemed established, and the trial shall be conducted accordingly."
This is an especially useful tool in litigation involving complex fact situations as are illustrated by this case. In this case partial summary judgment was granted as to counts
rather than specifics contained in those counts about which there was no genuine issue of material fact.
When a partial summary judgment is specific it may economize time and simplify and clarify the controverted issues that remain and in addition eliminate from trial material facts which are not genuinely controverted. Also, certain other issues which are irrelevant to the remaining claims for relief may be eliminated and those facts which are admitted or not controverted may be set out and thus obviate the necessity for proof of them.
Pursuant to Rule 56 (d), the court entered the rather extensive order dated 12 July 1978. South's motion for summary judgment was submitted upon, among other things, the pleadings and the deposition of Pete Thomas of 22 April 1975. Shades Ridge made a factual response based on affidavits of Pete Thomas, Charles Denaburg, Ed Bailey, and the attorneys who represented Shades Ridge. Shades Ridge also introduced numerous depositions.
 Count Five
In count five Shades Ridge alleged that on 1 June 1973, it executed an agreement to modify the ground lease. Also, that on 1 June 1973 it executed a mortgage to South which provided in substance:
(1) That if default should be made in the payment of the indebtedness or in the "performance of any covenant, condition, or agreement" of the mortgage by Sandner (mortgagor), South (mortgagee) would immediately give written notice to Shades Ridge.
(2) That the failure by Sandner to observe any covenant, condition or agreement of the mortgage, the promissory note secured by the mortgage, or "any other instrument securing the Note and all instruments collateral thereto or executed in connection with the loan secured by this Mortgage" would constitute an event of default.
(3) The "collateral instruments" referred to in the said mortgage included the lease from Shades Ridge to Sandner and the loan commitment from First Federal of Miami.
(4) South breached and violated the terms of said mortgage in that South failed to give Shades Ridge written notice of Sandner's several defaults in the performance of covenants in loan documents, including, inter alia, the following: (a) Sandner's failure to complete the buildings and improvements in accordance with plans and specifications of First Federal; (b) Sandner's failure to provide the project with first class equipment; (c) Sandner's failure to perform and observe all of the terms, covenants and conditions of the ground lease.
With regard to count five the trial court stated:
 "In Count Five, Shades Ridge bases its claim on the provisions of the mortgage executed to South and then immediately transferred to First Federal. Paragraph 26 of the mortgage instrument does require the mortgage to give immediate written notice to Shades Ridge of any default in the performance of any of the terms of the mortgage. The obvious purpose of this provision was to give Shades Ridge the opportunity to cure any default before the mortgagee declared all payments due or commenced foreclosure proceedings against the property. The Court here finds no basis for Shades Ridge's claim that the mortgage instrument may be made the basis of a contract or agreement or that it incorporates an agreement on the part of South to give Shades Ridge written notice of Sandner's failure to complete the buildings and *Page 614 
improvements and equip the same in accordance with the plans and specifications."
At the time it ruled on the motion for summary judgment the trial court had before it the ground lease of 2 April 1971, the modifications to it of 1 June 1973, and the mortgage of 1 June 1973 on the 14-acre tract. The mortgage contained the following provisions:
 "4. Mortgagor [Sandner] shall pay all debts, claims or other charges that may become liens against the premises or any part thereof for repairs or improvements that may have been or may hereafter be, made on the premises and shall not permit any lien or encumbrance of any kind which become superior to the title of Mortgagee [South] or the lien of this mortgage to accrue or remain on the premises or any part thereof.
* * * * * *
 "19. Anything contained in this mortgage to the contrary notwithstanding, to the extent that the outstanding principal indebtedness does not exceed the sum of One Million Seven Hundred Twenty-Five Thousand and no/100 Dollars ($1,725,000.00), the undersigned Mortgagor shall be under no personal liability under this mortgage or said note, and the holder of this mortgage and said note shall look solely to the mortgaged premises for payment of the above specified principal indebtedness by said note and secured by this mortgage and for the performance of the obligations and covenants set forth and contained in said note and this mortgage; and in the event of foreclosure or sale of the premises under the power of sale contained herein or otherwise, and/or the exercising by the Mortgagee of its right under said assignment of Mortgagor's interest in leases, no deficiency judgment shall be obtainable against the Mortgagor to the extent of the above specified principal indebtedness. Nothing herein contained shall impair the validity of the indebtedness evidenced by said note or in any way affect or impair the lien of this mortgage or the right of the holder of this mortgage to foreclose the same following a default by the undersigned in the making of the payments provided by said note or in the performance of any of the terms, convenants and conditions of this mortgage or the note evidencing the debt secured hereby.
* * * * * *
 "24. Any one or more of the following events shall constitute an event of default:
* * * * * *
 "(b) Failure by Mortgagor to duly observe any other covenant, condition or agreement of this mortgage or the Note or any other instrument securing the Note and all instruments collateral thereto or executed in connection with the loan secured by this Mortgage; * * *
* * * * * *
 "25. The Mortgagor covenants that, in addition to the payment of all rent, additional rent, impositions (as defined in the ground lease), and other payments and charges required to be paid by the Mortgagor, as lessee or tenant, under and pursuant to the provisions of the ground lease, the Mortgagor:
 "(a) will diligently perform and observe all of the terms, covenants and conditions of the ground lease
required to be performed and observed by the Mortgagor as such lessee or tenant unless such performance or observance shall have been waived or not required by the lessor or landlord under the ground lease, to the end that all things shall be done which are necessary to keep unimpaired the Mortgagor's rights as lessee or tenant under the ground lease;
* * * * * *
 "26. If default shall be made in the payment of the indebtedness secured hereby or any part thereof in accordance with the terms thereof, or in the performance of any covenant, condition, or agreement of this mortgage, the mortgagee [South] shall immediately give written notice to Shades Ridge Holding Company, Inc., at its address herein after specified, *Page 615 
or at such other address given in writing to the mortgagee, and Shades Ridge Holding Company, Inc. shall have thirty (30) days from the receipt of such written notice of default to cure such default." (Emphasis added.)
In Brown v. First National Bank of Montgomery, 261 Ala. 565,568, 75 So.2d 141, 143 (1954), the court stated:
 "It has been held by this court, in accord with what appears to be the general rule, that in certain instances notes and contemporaneous written agreements such as mortgages, executed as part of the same transaction, are to be construed together as forming one contract."
Paragraph 25 expressly refers to the ground lease as providing terms, covenants, and conditions and paragraph 24 provides that default includes failure to observe covenants, conditions, or agreements of the mortgage or all instruments collateral thereto or executed in connection with the loan secured by the mortgage. The date that both instruments bear, 1 June 1973, should be sufficient to provide evidence that they were executed in connection with the mortgage. Furthermore, the express reference to the ground lease in paragraph 25 provides a reasonable inference that it was a collateral instrument referred to in paragraph 24 defining default. Paragraph 26 does not attach any contingency or condition upon the requirement that notice be given. It merely provides that notice shall be given upon default. We cannot say as a matter of law that this mortgage did not require the mortgagee to notify Shades Ridge of any default as it is defined by the contract nor can it be said that this contract by the terms expressed on the face of the instrument is unambiguous. S T Leasing Corp. v. AlabamaHighway Express, 335 So.2d 384 (Ala. 1976). Entry of partial summary judgment as to count five is error because the contract is not unambiguous. It appears from the face of the instrument that there is a genuine issue of fact as to the meaning of the terms of the contract.
 Count Ten
The trial court granted summary judgment on Shades Ridge's count ten which, among other things, alleged that (1) South was a mortgage lending institution and broker for various other lending institutions; (2) construction loans were made to Sandner, Haralson, and Harrison; (3) the interest of Haralson and Harrison were undisclosed and concealed from Shades Ridge; (4) South knew that Shades Ridge in executing the mortgage was exposing its real property to danger of foreclosure without a concomitant exposure of Sandner to personal loss; (5) South owed Shades Ridge a fiduciary duty of care and loyalty by virtue of its employment by Shades Ridge and by virtue of the fact that Shades Ridge reposed, and had the right under the circumstances to do so, special trust and confidence in South; (6) South breached its fiduciary duty in that; (a) Haralson, its chief lending officer had secret equity interests in the projects; (b) Haralson made secret profits from the proceeds of the mortgage loans at the expense of Shades Ridge; (c) South failed to communicate to Shades Ridge the material fact that Harrison and Haralson owned hidden equity interests in the projects and that they made secret profits from the construction loan proceeds at Shades Ridge's expense. The trial court determined that although Haralson, South's chief lending officer, attended the meeting concerning the two projects there is no evidence of South assuming any fiduciary obligation to Shades Ridge. Instead, the trial court stated, Sandner undertook the financing of the two projects. We assume that implicit in that statement was the conclusion that any fiduciary obligations owed by South were owed Sandner.
As to count ten we cannot say that South met, by its factual showing, its obligations to demonstrate that no genuine issue of any material fact exists under that count. At issue here is not only whether there is an obligation to disclose by virtue of a fiduciary relationship arising out of Shades Ridge's employment of South as a mortgage broker but also whether the *Page 616 
particular circumstances of the case impose upon South a like duty to disclose. South did introduce a deposition, not controverted, to establish that it had no employment relationship with Shades Ridge but rather it was with Sandner. Therefore, we cannot fault the trial court for finding no issue as to whether a fiduciary duty existed. However, there was no basis for the trial court's finding, on motion for summary judgment, that the particular circumstances did not impose a duty to communicate. Where there still exists a factual dispute, and the burden rests on the movant to show no such factual dispute exists, then the trial judge cannot make material factual findings as a predicate to entry of partial summary judgment. Ray v. Midfield Park, 293 Ala. 609,308 So.2d 686 (1975); Bethune v. City of Mountain Brook, 293 Ala. 89,300 So.2d 350 (1974).
The facts alleged in the count properly state a claim of actionable fraud based upon a duty to disclose or to communicate as is shown in Washington v. Ford Motor CreditCompany, Inc., 384 So.2d 83 (Ala. 1980), where the defendant has special knowledge or means of knowledge not open to the plaintiff and is aware that the plaintiff is acting under a misapprehension as to facts which would be of importance to him and would probably affect his decision.
The movant did not meet its burden of establishing the absence of a genuine issue as to a material fact regarding this claim but in light of the fact this claim for relief was also effectively included in counts one and thirteen any error in this respect is harmless.
 Count Twelve
In count twelve Shades Ridge charged that its officers were only authorized to execute a mortgage at an 8 1/2% interest rate and the mortgage was in fact executed for an 8 3/4% interest rate. For this reason, Shades Ridge alleges, the mortgage is void. The trial judge, in ruling on South's motion for summary judgment, stated that Shades Ridge received a consideration of $2.3 million as evidenced by the note and mortgage and therefore could not repudiate the mortgage. We think the trial judge is correct even though Shades Ridge may not have received the entire $2.3 million. It would be inconsistent to hold that Shades Ridge was entitled to damages for fraud and the consequent loss of its property by foreclosure of a void mortgage.
For the reasons stated we find the trial court erred in granting summary judgment as to counts five and ten.
The judgment below is due to be, and is hereby, reversed and the case remanded for further proceedings not inconsistent with this opinion.
REVERSED AND REMANDED.
TORBERT, C.J., and MADDOX, FAULKNER and ALMON, JJ., concur.