Rel: August 22, 2025

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**.  Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

## SPECIAL TERM, 2025

———————————————

### SC-2024-0153

———————————————

### Daniel Flickinger

### v.

### Lawrence Tracy King and King Simmons Ford & Spree, P.C.

### Appeal from Jefferson Circuit Court
### (CV-21-226)

On Application for Rehearing

McCOOL, Justice.[1]

The opinion issued in this case on May 9, 2025, is withdrawn, and the following opinion is substituted therefor.

Daniel Flickinger appeals from a summary judgment issued by the Jefferson Circuit Court in favor of Lawrence Tracy King and the law firm of King Simmons Ford & Spree, P.C. ("the King law firm"), which we will refer to collectively as "the King defendants." For the reasons set forth herein, we affirm the judgment in part, reverse it in part, and remand the case for further proceedings.

<u>Facts and Procedural History</u>

This is the second time these parties have been before this Court on appeal.[2] In <u>Flickinger v. King</u>, 385 So. 3d 504 (Ala. 2023), which involved the circuit court's dismissal of Flickinger's claims against the King defendants, this Court set forth the following facts:

"At the time of the events underlying the present lawsuit, Flickinger had been employed as a full-time litigator at Wainwright, Pope & McMeekin, P.C. ('WPM'), for

---

[1]This case was originally assigned to another Justice on this Court; it was reassigned to Justice McCool on January 21, 2025.

[2]Flickinger also previously filed a petition for a writ of mandamus in 2021, in which he sought a change of venue. This Court denied that petition by order on January 26, 2022. <u>Ex parte Flickinger</u> (No. 1210131).

approximately 11 years. According to Flickinger, during the course of his career with WPM, he had been active on various social-media platforms and had often posted 'conservative political and cultural commentary' on those platforms. Flickinger maintained that, when he posted such commentary, he always did so in his 'personal capacity' and that he never 'listed his place of employment on his personal social media profiles or in conjunction with his personal social media posts.'

"It is undisputed that, in June 2020, Flickinger posted the following message on his personal Facebook page, apparently regarding the death of George Floyd[3]:

"'Things I think about: If I were a seven-time felon, with my most recent prison stint stemming from robbing and holding a pregnant woman at gunpoint in her home, would I choose to die in a fentanyl and methamphetamine numbed strangulation if it meant being worshipped in a nationwide funeral and my family receiving millions of dollars? Purely hypothetical.'

"On June 9, 2020, Flickinger received a telephone call from his supervising attorney, Lonnie Wainwright, during which Wainwright revealed that King had contacted him regarding Flickinger's social-media post. Wainwright asked that Flickinger meet with him the following day. According to Flickinger, shortly after speaking with Wainwright, he received a 'cryptic tweet' from the King law firm's Twitter social-media account -- @KingSimmonsPC -- that contained a

---

[3]George Floyd, a black man, died in May 2020 while being arrested by Derek Chauvin, a white police officer. Floyd's death received national media coverage and sparked nationwide riots and protests. Chauvin was later convicted of murdering Floyd and was sentenced to 270 months' imprisonment. See State v. Chauvin, 989 N.W.2d 1 (Minn. Ct. App. 2023).

'large eyes emoji' along with one of Flickinger's posts from several days earlier on his personal Facebook page.

"The next day, June 10, 2020, Flickinger met with the partners of WPM. Although, according to Flickinger, the WPM partners at the meeting admitted that they 'did not understand social media' and were 'not on social media,' they expressed that they were very concerned about the public connection between his social-media post and their law firm, and, according to Flickinger, one partner asked: 'How could you do this to us?'

"After Flickinger asked the WPM partners numerous times for a copy of the actual images sent to them by the King defendants, Flickinger says, 'the managing partner … permitted [Flickinger] to view his phone, which depicted an image that was generated, manufactured, sent, published, and/or distributed by Lawrence T. King and King Simmons Ford Spree, P.C. containing <u>a counterfeit social media profile</u> using [Flickinger's] professional credentials that [Flickinger] had never used in conjunction with personal social media posts.' (Emphasis added.) According to Flickinger, the allegedly 'counterfeit' social-media profile contained a professional photograph 'appropriated' from WPM's Web site that, he said, he had never used on any of his personal social-media platforms as well as the name of Flickinger's employer, which, he maintains, he had 'never advertised or shared in conjunction with any of his personal social media posts.'

"According to Flickinger, digitally merged with this 'counterfeit' social-media profile were additional social-media posts appropriated from his personal social-media platforms that were critical of the mass nationwide violence that had been going on in the wake of George Floyd's death. Additionally, offensive comments about his initial social-media post about George Floyd's death had been added to that 'counterfeit' profile to make it appear that third persons were commenting directly on the social-media post. Those

4

comments included statements that Flickinger was a 'racist' and that WPM was 'a business that supports racism.'

"Flickinger was then told that the WPM partners had had discussions with King about the King defendants' 'ability and willingness to control the distribution of the false and defamatory images favorably for WPM.' At the conclusion of the meeting, Flickinger was informed that either he must resign or WPM would pursue 'other [more punitive] options.' Flickinger resigned.

"After Flickinger resigned, the WPM partners informed him that they had spoken on the phone with King a second time and that King had told them again about the King defendants' 'ability and willingness to control the distribution of the false and defamatory images favorably for WPM.' The very next day, the following 'tweet' appeared on the @KingSimmonsPC Twitter page:

"'We represent a lot of hurt workers across Alabama, & spar w/lots of great defense lawyers. Those @ [WPM] (2 of whom I've know for well over 34 years) are as diligent, fair, upright, honest, & ethical as are found anywhere. Felt like saying it. #RESPECT.'

"Additionally, a Facebook page belonging to an individual who Flickinger alleges is a 'co-conspirator' with the King defendants contained the following message:

"'Now that [Daniel Flickinger] has been erased, I want to say that the firm he worked for has a great reputation in town and they are honest, professional, kind people. Good for them for such a fast and definitive response.'

"Flickinger subsequently discovered that the King law firm's Twitter page contained 'tweets' allegedly authored by

5

the King defendants 'gloating over the employment termination of private citizens solely on the basis of citizens expressing thoughts and opinions with which [the King defendants] disagreed.' For example, Flickinger noticed that, before the events underlying the present action occurred, the following post appeared on the @KingSimmonsPC Twitter page regarding the employment termination of a different person:

> "'5/12/2020: Here's a white guy that got fired by his law firm employer. He wouldn't wear a mask in a "ghetto store" and bragged about his guns and ammo. What a turd …'

"In addition, Flickinger alleges that he later discovered that members of a 1,500-plus member 'private' Facebook group named 'CALLING OUT ALABAMA BUSINESSES THAT SUPPORT RACISM' had been posting the following statements accusing him of being a 'racist' and accusing WPM of being a 'business that supports racism':

> "• 'Calling Out Alabama Businesses That Support Racism … So [Daniel Flickinger] is a lawyer! Who knows what kinda ethical damage he's done?! He works at Wainwright, Pope, McMeekin, P.C.'

> "• 'I went to school for years with this asshole … Racist condones running over protestors a few posts down …'

> "• '…. DEFINITELY email [Daniel Flickinger's] firm. Firms are firing people left and right for being racist scumbags (and rightfully so)'

> "• 'Ugly inside and out'

> "• 'What a f***ing piece of s**t'

6

"According to Flickinger, King was a member of this 'private' Facebook group, something that King now denies."

385 So. 3d at 507-09 (footnote omitted).

Based on those events, Flickinger sued the King defendants, asserting claims of defamation, invasion of privacy, and tortious interference with a business relationship. On the King defendants' motion, the circuit court dismissed Flickinger's claims, and, in Flickinger, this Court affirmed the dismissal of the defamation and invasion-of-privacy claims. However, the Court held that the allegations in Flickinger's complaint were sufficient to state a claim of tortious interference with a business relationship, and, thus, the Court reversed the circuit court's dismissal of that claim and remanded the case for further proceedings.

In July 2023, the King defendants moved for a summary judgment on Flickinger's tortious-interference claim, arguing that "there is no substantial evidence that any of the [King defendants'] asserted conduct proximately caused any damages of which [Flickinger] complains." According to the King defendants, "as to employment decisions that were made affecting [Flickinger] in this at-will employment state, there are three people alone who can speak to what motivated the employment

7

decision at issue: the partners at Wainwright, Pope & McMeekin who made that decision." In support of their motion, the King defendants provided the affidavits of Lonnie Wainwright, Linda Pope, and Steven McMeekin, the partners of Wainwright, Pope & McMeekin, P.C. ("WPM"), who had told Flickinger that "either he must resign or WPM would pursue 'other [more punitive] options.'" Flickinger, 385 So. 3d at 509.

Wainwright's affidavit states, in relevant part:

"I was one of the decision-makers who made the personnel decisions involving [Flickinger] and the end to his employment. He was offered the opportunity to resign his employment as a matter of his choice, and he did resign of his choice. To be very clear, the personnel decision that was unanimously made by the three partners to offer him the opportunity to resign was not based on any information other than our personal review with our own eyes of various open public social media posts that were made by [Flickinger]; the decision was not made, or suggested, recommended, approved, solicited, or ratified by the named Defendants or anyone else.

"....

"When our law firm's three decision-makers reviewed [Flickinger's] social media posts, we decided upon the personnel decision to offer [Flickinger] the opportunity to resign. The unanimous decision was made solely and exclusively by the firm's three decision-makers. King and the other Defendants had no input or involvement whatsoever in the employment decision of our firm.

"King … made very clear that he advocated absolutely no course of personnel decision-making at all, or that any decision-making even occur; to the contrary, he expressed only that he would want to know if one of his lawyers had made similar such posts."

(Emphasis in original.)

Pope's affidavit states, in relevant part:

"In June of 2020, I was a partner with the law firm of [WPM]. I was, at the time, one of the decision-makers with regard to employment personnel decisions. Prior to making any decisions involving … Flickinger, I did my own independent research into Flickinger's posting history. It was that independent research, rather than a single post, which [led] to any and all personnel decisions that the firm made with respect to Flickinger.

"I received the same screenshot of a social media post from two different sources -- Larry King and Don Rhea [--] on the same night. Thus, even had … King not forwarded the screenshot, I still would have learned all of the same information which [led] me to the independent research that [led] to our firm's personnel decision."

McMeekin's affidavit states, in relevant part:

"On or about June 9, 2020, I learned that … Flickinger had made several inflammatory posts on social media that could harm the image of my law firm.

"Prior to making any personnel decision involving … Flickinger, one of the other partners in the law firm, Linda Pope, did her own independent research into Flickinger's social media posting history and located numerous additional inflammatory and divisive posts. In one of those posts, Flickinger indicated that he had received economic threats

due to his posts. That caused great concern, as economic harm to … Flickinger would necessarily implicate our law firm.

"It is my understanding that this lawsuit i[s] based on the fact that … King … shared a screenshot of one of Flickinger's social media posts that was re-posted in a Facebook group by an individual named Shawn Avery. Each of the three partners in the firm, Lonnie Wainwright, Linda Pope, and myself[,] received the same screenshot from another source on the same night that the information was provided by … King. Thus, even had … King not provided the screenshot, we still would have learned the exact same information and made all the same personnel decisions."

The summary-judgment hearing was scheduled to occur on December 13, 2023, and the circuit court set November 27, 2023, as the deadline for completing discovery. On October 5, 2023, Flickinger filed notice of his intent to have the circuit court serve a subpoena to T-Mobile USA ("T-Mobile"), which is King's cellular-telephone-service provider. That subpoena, which Flickinger attached to his notice, sought the production of a "complete copy of cellular telephone records for [King's] cell phone number" during "the time period of May 25, 2020, to September 1, 2020." Five days later, the King defendants objected to the subpoena on several grounds, including that it sought "confidential information," sought information that was not "reasonably calculated to lead to admissible evidence," and was overly broad. Thus, the subpoena

10

did not issue. See Rule 45(a)(3)(B), Ala. R. Civ. P. ("Any person or party may serve an objection to the issuance of a subpoena for production, inspection, copying, testing, or sampling within ten (10) days of the service of said notice and in such event the subpoena shall not issue."). On November 28, 2023 -- the day after the circuit court's discovery deadline -- Flickinger filed a motion "to compel/order the issuance of [his] October 5, 2023, non-party cell-phone records subpoena to T-Mobile." See id. (providing that, if there is an objection to a subpoena for production, the party seeking the subpoena may move for an order to compel production under Rule 37(a), Ala. R. Civ. P.).

On December 1, 2023, the King defendants amended their summary-judgment motion, arguing that "no corporate liability" can be imposed on the King law firm for King's act of alerting the WPM partners to Flickinger's social-media post regarding the death of George Floyd (hereinafter referred to as "the George Floyd post"). In support of that argument, the King defendants contended that there "is absolutely no suggestion whatsoever that [King's act] was within the line and scope of his work as an attorney for the [King] law firm" or that it "benefit[ed] the [King] law firm." Flickinger filed a response to the amended summary-

11

judgment motion, but he did not acknowledge the King defendants' "no corporate liability" argument.

On December 11, 2023, Flickinger filed a motion to continue the summary-judgment hearing and asked the circuit court to "reschedule the hearing at least 90 days after [the court] rule[d] upon [his] pending Motion to Compel … such that [he] may have sufficient time to complete discovery."  The King defendants objected to Flickinger's motion to continue, and the circuit court did not rule on the motion before conducting the summary-judgment hearing.  Instead, the circuit court made the following statement at the beginning of that hearing:

> "[W]hen I have this come up in summary judgment proceedings, motions to continue [and] motions for more discovery, … which are in the record which I've already read[,] I do what I'm going to do here which is I just hear everything and it's only after I've gone through the whole process that I can really understand whether a certain piece of evidence can be properly used in summary judgment or not and … whether it makes a difference; we'll just have to see.
>
> "Same with motions to continue.  I really can't fully understand the import of a [motion to continue] … to put in additional information or to seek additional information until I see where we are and what the [movant] is saying and whether it would make a difference or not, so I am going to rule on the [motion to continue] before I rule on the summary judgment, but I'm going to consider all those at the same time so I can get an understanding of how they interact."

12

The circuit court then heard arguments from the parties on all pending motions, during which the court questioned whether Flickinger's tortious-interference claim suffered from a lack of "proximate cause."

Following the hearing, the circuit court issued an order denying Flickinger's motion to compel the production of King's cellular-telephone records and an order denying Flickinger's motion to continue the summary-judgment hearing. The circuit court did not provide its reasons for denying those motions. The circuit court then issued a summary judgment in favor of the King defendants. That judgment states, in relevant part:

> "The focal point of [the King defendants'] Motion for Summary Judgment is the issue of causation. Specifically, [the King defendants] contend that [Flickinger] does not, and cannot, adduce substantial evidence that the [King defendants] intentionally interfered with his employment at [WPM] because Wainwright, Pope, and McMeekin have each unequivocally and consistently testified that the decision to ask [Flickinger] to resign from his employment was theirs alone and that their decision was precipitated by social media posts [Flickinger] admits he made. [The King defendants'] contention is amply supported by the Record evidence.
>
> "The first time Wainwright, Pope, and McMeekin provided testimony in this case [was] March of 2021, by sworn affidavits. Paragraph 6 of the Wainwright, Pope, and McMeekin affidavits provides:

13

"'I was one of the decision-makers who made the personnel decisions involving [Flickinger] and the end to his employment as a matter of his choice, and he did resign of his choice. To be very clear, the personnel decision that was unanimously made by the three partners to offer him the opportunity to resign was <u>not</u> based on any information other than our personal review with our own eyes of various open public social media posts that were made by [Flickinger]; the decision was <u>not</u> made, or suggested, recommended, approved, [or] solicited by the [King defendants] or anyone else.'

"Additional fact discovery in the years since the Wainwright, Pope, and McMeekin affidavits were first submitted has neither diminished the strength of their causation testimony nor created any genuine issue of material fact regarding the same.

"WHEREFORE, this Court finds and holds that there remains no genuine issue of material fact on the issue of causation and that [the King defendants] are entitled to a judgment in their favor as a matter of law on the last remaining claim herein: tortious interference."

(Citations to record omitted.)

Flickinger has appealed, arguing that the circuit court erred by concluding that the King defendants were entitled to a judgment as a matter of law on his tortious-interference claim. Flickinger also argues that the circuit court erred by denying his motion to compel the production of King's cellular-telephone records and by denying his motion

14

to continue the summary-judgment hearing so that he would have time to obtain those records. The King defendants disagree with Flickinger's arguments, and they also argue that, even if the summary judgment is not due to be affirmed as to King, it should nevertheless be affirmed as to the King law firm.

## Standard of Review

"'"The standard of review applicable to a summary judgment is the same as the standard for granting the motion ...." McClendon v. Mountain Top Indoor Flea Market, Inc., 601 So. 2d 957, 958 (Ala. 1992).

"'"A summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Rule 56(c)(3), Ala. R. Civ. P. The burden is on the moving party to make a prima facie showing that there is no genuine issue of material fact and that it is entitled to a judgment as a matter of law. In determining whether the movant has carried that burden, the court is to view the evidence in a light most favorable to the nonmoving party and to draw all reasonable inferences in favor of that party. To defeat a properly supported summary judgment motion, the nonmoving party must present 'substantial evidence' creating a genuine issue of material fact -- 'evidence of such weight and quality

15

> that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.' Ala. Code 1975, § 12-21-12; West v. Founders Life Assurance Co. of Florida, 547 So. 2d 870, 871 (Ala. 1989)."
>
> "'Capital Alliance Ins. Co. v. Thorough-Clean, Inc., 639 So. 2d 1349, 1350 (Ala. 1994). Questions of law are reviewed de novo. Alabama Republican Party v. McGinley, 893 So. 2d 337, 342 (Ala. 2004).'
>
> "Pritchett v. ICN Med. All., Inc., 938 So. 2d 933, 935 (Ala. 2006)."

Burton v. Hawkins, 364 So. 3d 962, 969-70 (Ala. 2022).

## Discussion

In Flickinger, this Court set forth the five elements of a claim alleging a tortious interference with a business relationship, which are "'(1) the existence of a protectible business relationship; (2) of which the defendant knew; (3) to which the defendant was a stranger; (4) with which the defendant intentionally interfered; and (5) damage.'" 385 So. 3d at 515 (quoting White Sands Grp., L.L.C. v. PRS II, LLC, 32 So. 3d 5, 14 (Ala. 2009)). The Court also noted that the fourth element -- whether the King defendants intentionally interfered with Flickinger's employment -- is the only element in dispute in this case. However, there

16

is no dispute that the act that constituted the alleged interference with Flickinger's employment was King's act of alerting the WPM partners to the George Floyd post.

## I.

The first argument we address is the King defendants' argument that the summary judgment should be affirmed as to the King law firm regardless of whether it is affirmed as to King. In support of that argument, the King defendants contend that King's act of alerting the WPM partners to the George Floyd post can impose "no corporate liability" on the King law firm because, they say, there "is absolutely no suggestion whatsoever that [King's act] was within the line and scope of his work as an attorney for the [King] law firm" or that it "benefit[ed] the [King] law firm." King defendants' brief, p. 40. As noted, the King defendants raised this argument below, but the circuit court did not need to address it -- and did not address it -- because the court concluded that Flickinger's claim failed as a matter of law on "the issue of causation." However, this Court may affirm the circuit court's judgment on any valid legal ground, Murey v. City of Chickasaw, 385 So. 3d 903, 912 (Ala. 2023), and we agree that the King defendants' "no corporate liability" argument

17

provides a basis for affirming the summary judgment as to the King law firm.

The King law firm is, as Flickinger noted in his complaint, "an Alabama domestic professional corporation." "'A corporation or employer will be liable for the torts of its employee committed <u>while acting in the line and scope of his employment</u> even though the corporation or employer did not authorize or ratify such acts and even if it expressly forbade them.'" <u>QHG of Enterprise, Inc. v. Pertuit</u>, 323 So. 3d 1171, 1180 n.11 (Ala. 2020) (quoting <u>Lawler Mobile Homes, Inc. v. Tarver</u>, 492 So. 2d 297, 305 (Ala. 1986)) (emphasis added). "'An act is within an employee's scope of employment if the act is done as part of the duties the employee was hired to perform or if the act confers a benefit on his employer.'" <u>Cobbs, Allen & Hall, Inc. v. EPIC Holdings, Inc.</u>, 335 So. 3d 1115, 1139 (Ala. 2021) (quoting <u>Hulbert v. State Farm Mut. Auto Ins. Co.</u>, 723 So. 2d 22, 23 (Ala. 1998)) (emphasis omitted). An employee's act is <u>not</u> within the line and scope of his employment, however, "when the employee acts on wholly personal motives that would not 'reasonably further' the employer's business." <u>East Alabama Behav. Med., P.C. v. Chancey</u>, 883 So. 2d 162, 168 (Ala. 2003) (citation omitted)). <u>See also</u>

18

Hendley v. Springhill Mem'l Hosp., 575 So. 2d 547, 550 (Ala. 1990) (plurality opinion) ("A tort committed by an agent, even if committed while engaged in the employment of the principal, is not attributable to the principal if it emanated from wholly personal motives of the agent and was committed to gratify wholly personal objectives or desires of the agent."). Thus,

> "'[i]f there is any evidence in the record tending to show directly, or by reasonable inference, that the tortious conduct of the employee was committed while performing duties assigned to him, then it becomes a question for the jury to determine whether he was acting from personal motives having no relationship to the business of the employer. Plaisance v. Yelder, 408 So. 2d 136 (Ala. Civ. App. 1981); United States Steel Co. v. Butler, 260 Ala. 190, 69 So. 2d 685 (1953).'"[4]

---

[4]King is not a rank-and-file employee of the King law firm because he is a partner in the firm and "the sole equity owner." Nevertheless, the dispositive question is still whether King's allegedly tortious act was within the line and scope of his employment. See Ermert v. Hartford Ins. Co., 559 So. 2d 467, 475, 476 (La. 1990) (holding that the dispositive question for purposes of determining whether a corporation was liable for its employee's tort was whether the employee was acting "within the scope of his employment" at the time of the tort, even though the case was "somewhat atypical in that [the employee] was not a rank and file employee but the founder, majority stockholder …, president and chief executive officer and primary business generator of [the] closely-held corporate business"; "managers of great corporations are considered servants, albeit superior servants, differing only in the dignity and importance of their positions from those working under them").

USA Petroleum Corp. v. Hines, 770 So. 2d 589, 591 (Ala. 1999) (quoting Tarver, 492 So. 2d at 305).

The King defendants' evidence indicates that, at approximately 9:00 p.m. on June 9, 2020 -- several hours after typical business hours had ended -- King texted a "screenshot" of the George Floyd post to Wainwright and Pope because King had a long-term friendship with them. The King defendants' evidence also indicates that King sent the George Floyd post to Wainwright and Pope only because King was concerned about the reputation of WPM and would have wanted to know if an attorney in his own law firm had posted something of that nature on a social-media platform. That evidence was sufficient to establish a prima facie showing that King's act stemmed from "wholly personal motives" unrelated to his employment and that it did not confer any benefit on the King law firm. Chancey, 883 So. 2d at 168. Thus, Flickinger had the burden of presenting substantial evidence that creates a genuine issue of material fact as to whether King's act was within the line and scope of his employment or benefited the King law firm. Pritchett, supra.

As noted, Flickinger made no attempt in the circuit court to refute the King defendants' "no corporate liability" argument.[5] However, on appeal, Flickinger contends that King is the "sole managing and equity partner" of the King law firm and thus had the "sole authority to define the parameters of his employment." Flickinger's reply brief, pp. 26-27. Flickinger then points to evidence indicating that, approximately 10 days before King sent the George Floyd post to Wainwright and Pope, King had "announced on his firm's @KingSimmonsPC Twitter account his mission to '… call out racism … at home and at work.'" Id. at 27 (emphasis in brief). Flickinger also argues that the King law firm benefited from King's allegedly tortious act because, according to Flickinger, "there can be no doubt that" King's act of "call[ing] out racism" "redounds to the benefit of the [King defendants'] reputation and influence." Id. at 30.

---

[5]Although the King defendants expressly raised their "no corporate liability" argument in their amended summary-judgment motion, Flickinger did not even acknowledge that argument in his written response to the motion, much less make any attempt to refute it. Flickinger did state at the beginning of the summary-judgment hearing that he was "definitely going to" refute that argument "with evidence from the depositions," but he never relied on the depositions in an attempt to connect the King law firm to King's allegedly tortious act.

Flickinger's arguments are unpersuasive. First, the evidence indicates that, although the @KingSimmonsPC Twitter account had been initially established as an account for the King law firm, that account had "served as King's personal Twitter account for a long time prior to May 2020" -- the month before King sent the George Floyd post to Wainwright and Pope -- and Flickinger has not challenged that evidence. Regardless, King's statement that it was his "mission to … 'call out racism … at home and at work'" does not demonstrate that his allegedly tortious act was within the line and scope of his employment because there is no evidence indicating that King earns his living or otherwise benefits the King law firm by "call[ing] out racism," even if he does so while "at work." Indeed, the only "benefit" that Flickinger contends the King law firm obtained as a result of King's act of "call[ing] out racism" was a boost to the firm's "reputation and influence," but that argument is purely speculative and not supported by any evidence. Moreover, such a benefit would be, at most, an incidental benefit to the King law firm, and "[t]he mere fact that an employee's independently motivated action happened to 'result in an incidental benefit to the employer' is not enough

to trigger respondeat superior liability." Madasu v. Shoals Radiology Assocs., P.C., 378 So. 3d 501, 506 (Ala. 2022) (citation omitted).

In short, even when considered in a light most favorable to Flickinger, the evidence indicates that King's act of sending the George Floyd post to Wainwright and Pope was not an act that was within the line and scope of King's employment and that it did not confer a benefit on the King law firm. Thus, the King law firm is entitled to a judgment as a matter of law on Flickinger's tortious-interference claim, which means that, if there is any liability for that act, the liability rests with King alone. We therefore affirm the summary judgment as to the King law firm, although, as noted, we do so for a different reason than the one the circuit court provided.

II.

We now consider whether the summary judgment should be affirmed as to King. On appeal, Flickinger challenges the circuit court's causation finding, i.e., that King's act of sending the George Floyd post to Wainwright and Pope was not what caused the WPM partners to terminate Flickinger's employment. According to Flickinger, proximate cause is not an element of a tortious-interference claim, but he argues

23

that, even if it is, the evidence supports a finding that King's act was "not merely the 'proximate cause,' but the 'but for' cause of [his] termination." Flickinger's brief, p. 37. In response, King argues that proximate cause is an "element common to all tort actions," King defendants' brief, p. 27, and he argues that his allegedly tortious act was not what "caused the damages of which [Flickinger] complains." Id. at 32. In support of that argument, King notes that the WPM partners "have sworn to a clear intervening cause independent of the King-to-Wainwright screenshot as the basis for the personnel decision" -- namely, their "'personal review with [their] own eyes of various open public social media posts that were made by [Flickinger].'" Id. at 33. Thus, according to King, "[t]he chain of proximate cause [was] … broken and interrupted." Id.

Flickinger is incorrect in arguing that proximate cause is not a relevant question in a tortious-interference case. See Rondini v. Bunn, 338 So. 3d 749, 753 (Ala. 2021) (noting that the concept of proximate cause applies to intentional torts, though it is treated differently than it is treated in negligence cases). However, King's argument is also flawed because he fails to recognize that "proximate cause … ha[s] a more

24

limited application in intentional-tort cases," such as tortious-interference cases, than it does in negligence cases. Id.

In Shades Ridge Holding Co. v. Cobbs, Allen & Hall Mortgage Co., 390 So. 2d 601 (Ala. 1980), this Court provided a thorough discussion of how the element of proximate cause is applied in intentional-tort cases:

> "There is … an explicit recognition that the meaning and effect of 'proximate cause' changes in relation to the context in which a case is brought. … Dean Prosser addresses this issue squarely. In discussing the foreseeability requirement usually imposed on liability for negligent conduct he states:
>
>> "'One area in which it may be especially likely that the "foreseeability" limitation will be cast aside is that of intentional torts, as to which it has been said often enough that there is more extended liability.' Prosser, Law of Torts (4th Ed. 1971), § 43 at p. 263.
>
> "This trend is dictated by the policy that liability even though potentially tremendous should be imposed on the wrongdoer rather than the victim be uncompensated. Hence, even very remote causation may be found where the defendant acted intentionally.
>
> "The Restatement (Second) of Torts, § 435A (1966), also recognizes this distinction between causation in cases of intentional and negligent torts. It states that even though the consequences were unexpectable, with an intentional tort, the defendant is liable for it even though had he been negligent he would not be so liable.

"There are a few cases which also address this issue directly: In <u>Johnson v. Greer</u>, 477 F.2d 101 (5th Cir. 1973), at pp. 106-107, the court stated:

"'… [T]he courts have generally held that where the acts of a defendant constitute an intentional tort or reckless misconduct, as distinguished from mere negligence, the aggravated nature of his action is a matter which should be taken into account in determining whether there is a sufficient relationship between the wrong and plaintiff's harm to render the actor liable. Specifically, the factors to be taken into account are the tort feasor's intention to commit a wrongful act, the degree of his moral wrong in so acting, and the seriousness of the harm intended.'

"This same view was expressed by the New Jersey Superior Court in a case of malicious prosecution. After discussing proximate cause at length the court stated:

"'A different matter is presented <u>where intentional acts are involved</u> and it is clear that <u>the rules of causation are more liberally applied</u> to hold a defendant responsible for the consequences of his acts. It is well settled that where the acts of a defendant constitute an intentional tort or reckless misconduct, as distinguished from mere negligence, the aggravated nature of his acts is a matter to be taken into account in determining whether there is a sufficient causal relation to plaintiff's harm to make the actor liable therefor. His intention to commit a wrongful act, the degree of his moral wrong in acting, and the seriousness of the harm[] which he intended are important factors in determining whether he is liable for resulting unintended harm. In applying concepts of "foreseeability" and "proximate cause" in such

cases there is more extended liability, and in a case involving such aggravated acts a fact finder may be permitted to find that the actor's conduct bears a sufficient causal relation to a plaintiff's harm so as to make him liable, although no such finding would be permissible if defendant's conduct were merely negligent. …' Seidel v. Greenberg, 108 N.J. Super. 248, 260 A.2d 863 (1969).

"In that case the court went on to say: 'Indeed, it appears likely that many of the limitations upon liability that are subsumed under the doctrine of "proximate cause," as usually expounded in negligence cases, do not apply to intentional torts.'

"The Mississippi Supreme Court has also recognized this distinction. In State ex rel. Richardson v. Edgeworth, 214 So. 2d 579, 587 (Miss. 1969), that court stated:

"'In short, the defendants' intentional conduct is a legal cause of harm to plaintiffs if their individual acts were substantial factors in bringing about the harm. … A higher degree of responsibility is imposed upon a wrongdoer whose conduct was intended to cause harm than upon one whose conduct was negligent. Lyons v. Zale Jewelry Co., 246 Miss. 139, 150 So. 2d 154 (1963) ….'"

390 So. 2d at 609-10 (emphasis added).

In this case, the circuit court concluded that Flickinger's tortious-interference claim failed as a matter of law on "the issue of causation" because each of the WPM partners has indicated that their "decision to ask [Flickinger] to resign from his employment was theirs alone" and

27

"was <u>not</u> made, or suggested, recommended, approved, [or] solicited by the [King defendants]." (Emphasis in original.) However, there is evidence indicating that the WPM partners had no knowledge of any of Flickinger's social-media activity before King sent the George Floyd post to Wainwright and Pope, and there is no evidence indicating that the WPM partners were considering terminating Flickinger's employment before King sent them that post. In addition, Wainwright admitted in his deposition that he "immediately" telephoned King after receiving the George Floyd post because he was "a little shook up," was "very concerned about [the WPM] firm," and was "thinking about damage control." Pope likewise contacted King "some few minutes … after [Wainwright] did" and was "upset" and "asked [King] what [WPM] should do about [its] reputation." When viewed in a light most favorable to Flickinger, that evidence indicates that, upon receiving the "screenshot" of the George Floyd post from King, the WPM partners immediately began considering the possibility of terminating Flickinger's employment, which they ultimately did the next day. Indeed, as this Court explained in <u>Flickinger</u>, we "cannot ignore the fact that the termination of Flickinger's employment occurred almost immediately after WPM was contacted by

King." 385 So. 3d at 517. Thus, the evidence provides a basis upon which a jury could potentially find that "'there is a sufficient relationship between [King's allegedly tortious act] and [Flickinger's] harm to render [King] liable.'" Shades Ridge, 390 So. 2d at 609-10 (citation omitted).

Granted, the circuit court correctly found that there is no evidence indicating that King recommended or suggested that the WPM partners terminate Flickinger's employment. However, as this Court explained in Shades Ridge, supra, a defendant's acts in an intentional-tort case need not be the "proximate" cause of the plaintiff's harm, at least as that term is used in negligence cases. Rather, a defendant's acts may subject him or her to liability for an intentional tort if the acts "'were substantial factors in bringing about the [plaintiff's] harm,'" 390 So. 2d at 610 (citation omitted), and "even very remote causation" may be a basis for imposing liability in such cases. Id. at 609. Viewed in a light most favorable to Flickinger, the evidence provides a basis upon which a jury could potentially find that King's act of sending the George Floyd post to Wainwright and Pope was one of the "substantial factors" -- if not the primary factor -- "in bringing about" the WPM partners' decision to terminate Flickinger's employment, id. at 610, regardless of the fact that

29

King did not recommend or suggest that decision. The fact that the WPM partners have indicated that the decision to terminate Flickinger's employment was "theirs alone" and had not been recommended or suggested by King does not change the fact that King set in motion the chain of events that culminated with that decision.

King argues, though, that "the chain of causation … [was] broken" by events that occurred subsequent to his allegedly tortious act. First, King notes that the WPM partners have indicated that their decision to terminate Flickinger's employment was not necessarily based on their receipt of the George Floyd post but, instead, was based on their "independent research into Flickinger's social media posting history," which, they contend, revealed "numerous additional inflammatory and divisive posts." However, as noted, the evidence indicates that the WPM partners had no knowledge of any of Flickinger's social-media activity before King sent the George Floyd post to Wainwright and Pope, and Wainwright conceded in his deposition that it was the WPM partners' receipt of the George Floyd post that prompted them to "start looking to see what else was out there." Thus, even if the WPM partners' decision to terminate Flickinger's employment was based on his social-media

activity as a whole, a jury could still potentially find that "'there is a sufficient relationship between [King's allegedly tortious act] and [Flickinger's] harm to render [King] liable.'" Shades Ridge, 390 So. 2d at 609-10 (citation omitted). Second, King notes that another attorney, Don Rhea (who is not from the King law firm), also sent the George Floyd post to the WPM partners approximately 30 minutes after King sent the post to Wainwright and Pope. Thus, according to King, "even had [he] never said a word to … Wainwright [and Pope], all three of the [WPM] partners would have learned the same information." King defendants' brief, p. 35. However, that fact does not necessarily absolve King of liability because, as noted, the evidence indicates that the WPM partners were already considering terminating Flickinger's employment before they received the George Floyd post from Rhea.

For the foregoing reasons, the circuit court erred by concluding that there is not a genuine issue of material fact as to the causation element of Flickinger's tortious-interference claim.[6] Cf. Glennon v. Rosenblum,

_____

[6]King contends on application for rehearing that, based on our causation analysis, "[i]t seems that this Court is attempting to completely do away with the 'intentional' aspect of" a tortious-interference claim. Brief in support of application for rehearing, p. 12. However, whether there is evidence to support a finding that King caused Flickinger's harm

31

325 F. Supp. 3d 1255, 1268 (N.D. Ala. 2018) (concluding that, under

Alabama law, the defendant was liable for tortious interference with a

business relationship because she had published a false story about the

plaintiff on a website and the plaintiff had "lost business relationships at

least in part because of [the] story").  That conclusion does not end our

---

and whether there is evidence to support a finding that King <u>intended</u> to cause that harm are two separate questions, and we have addressed only the former because that was the basis of the circuit court's judgment. Thus, nothing in this opinion changes the fact that the intent to interfere with a protectible business relationship is an element that a plaintiff must prove in order to prevail on a tortious-interference claim.

That said, we acknowledge King's argument that "[t]here is no evidence whatsoever in the record that [he] had any intent to harm Flickinger or to interfere with his employment" and that, "[t]o the contrary, the record makes it clear that [his] intent was to protect the WPM firm's reputation."  Brief in support of application for rehearing, p. 13.  There is certainly some evidence to support King's contention that he did not intend to interfere with Flickinger's employment, but it is inaccurate to say that there is "no evidence whatsoever" to the contrary. Specifically, there is evidence indicating that King found the George Floyd post to be offensive and that he has "'gloat[ed] over the employment termination of private citizens solely on the basis of citizens expressing thoughts and opinions with which [he] disagreed.'" <u>Flickinger</u>, 385 So. 3d at 509.  That evidence, when viewed in a light most favorable to Flickinger, provides a basis upon which a jury could potentially find that King sent the George Floyd post to Wainwright and Pope with the intent to interfere with Flickinger's employment.  Thus, in this case, as in most cases, "[i]ntent is a question of fact that is … to be determined by a jury." <u>General Inv. Corp. v. Texas Refinery Corp.</u>, 451 So. 2d 1373, 1378 (Ala. 1984) (emphasis omitted).

32

analysis, however, because King argues that he was justified in sending the George Floyd post to Wainwright and Pope, which, according to King, means that a summary judgment in his favor was proper regardless of any causation issues. Although King raised a justification defense in his summary-judgment motion, the circuit court's judgment indicates that it did not rely on that defense as a basis for granting the motion. Nevertheless, because this Court may affirm the circuit court's judgment on any valid legal ground, we will consider this argument. Murey, supra.

In EPIC Holdings, supra, this Court provided the following explanation regarding a justification defense in a tortious-interference case:

> "[I]n Gross v. Lowder Realty Better Homes & Gardens, 494 So. 2d 590 (Ala. 1986), this Court adopted a balancing test of factors provided in Restatement [(Second) of Torts] § 767 [(Am. L. Inst. 1979)], as well as the comments to that section, for evaluating a justification defense.
>
> > "'We retain the principle that justification is an affirmative defense to be pleaded and proved by the defendant. Whether the defendant is justified in his interference is generally a question to be resolved by the trier of fact. Polytec, Inc. v. Utah Foam Products, Inc., 439 So. 2d 683 (Ala. 1983). Whether a defendant's interference is justified depends upon a balancing of the importance of the objective of the interference against the importance of the interest interfered with, taking

33

into account the surrounding circumstances. Restatement (Second) of Torts § 767 (1979), and Comments. The restatement utilizes the term "improper" to describe actionable conduct by a defendant. Non-justification is synon[y]mous with "improper." If a defendant's interference is unjustified under the circumstances of the case, it is improper. The converse is also true. Section 767 of the Restatement lists, and the Comments explain, several items that we consider to be among the important factors to consider in determining whether a defendant's interference is justified:

> "'"(a) the nature of the actor's conduct,
>
> "'"(b) the actor's motive,
>
> "'"(c) the interests of the other with which the actor's conduct interferes,
>
> "'"(d) the interests sought to be advanced by the actor,
>
> "'"(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
>
> "'"(f) the proximity or remoteness of the actor's conduct to the interference, and
>
> "'"(g) the relations between the parties.

34

"'Restatement (Second) of Torts § 767 (1979).'

"Gross, 494 So. 2d at 597 n.3, overruled on other grounds by White Sands Grp., L.L.C. v. PRS II, LLC, 32 So. 3d 5 (Ala. 2009) …."

335 So. 3d at 1131-32 (emphasis added; other emphasis omitted). The Court also went on to explain, though, that § 767 of the Restatement (Second) of Torts (Am. L. Inst. 1979) ("the Restatement") does not apply in every case in which a justification defense is asserted. Rather, "the sections [of the Restatement] that follow § 767 'supplant' it when a scenario involving those specific applications is presented." 335 So. 3d at 1133. Thus, the Court "expressly h[e]ld that § 772 [of the Restatement] should be applied in appropriate factual scenarios …." Id. at 1134.

Section 772 of the Restatement states:

"One who intentionally causes a third person not to perform a contract or not to enter into a prospective contractual relation with another does not interfere improperly with the other's contractual relation, by giving the third person

"(a) truthful information, or

"(b) honest advice within the scope of a request for the advice."

(Emphasis added.)

In this case, King argues that he was justified in sending the George Floyd post to Wainwright and Pope because, according to King, he gave them truthful information. In other words, King argues that § 772 of the Restatement applies in this case and that his conveyance of allegedly truthful information is an absolute bar to Flickinger's tortious-interference claim. Flickinger argues in response, as he did in Flickinger, that King did not give Wainwright and Pope truthful information because, he says, although he admittedly authored the George Floyd post and posted it on his Facebook page, the "screenshot" that King sent to Wainwright and Pope was an image of "a 'counterfeit' social-media profile that appeared to show that Flickinger was making a controversial political statement on behalf of WPM." 385 So. 3d at 512-13.

The "screenshot" that King texted to Wainwright and Pope shows that a person named Shawn Avery posted the following comment on Avery's Facebook page: "Check out this racist little critter." Beneath Avery's comment is the photograph of Flickinger that was taken from the WPM website (hereinafter referred to as "the WPM photograph"), and beneath the WPM photograph is an image of the George Floyd post that was taken from Flickinger's Facebook page. Flickinger stated in his

36

affidavit, though, that he has never used the WPM photograph on his Facebook page, much less in conjunction with the George Floyd post, and King did not present any evidence to the contrary. In fact, King concedes that it was Avery who "took [the George Floyd] post and paired it with" the WPM photograph. King defendants' brief, p. 25. After receiving that "screenshot," Pope wrote: "Wow. Is that on his FB?" King first replied that he was "not sure" but then stated, "Yes. His FB," which was the last text message exchanged in that text-message thread until after Flickinger's employment had been terminated.

In Flickinger, this Court stated:

"Flickinger alleged in his complaint that the King defendants had shared a 'counterfeit' social-media profile that appeared to show that Flickinger was making a controversial political statement on behalf of WPM. Although Flickinger does not dispute that the statement in the post that was shared was his and was, therefore, truthful, he pleaded that the remainder of the post -- coupled with the 'counterfeit' social-media profile -- falsely associated his political views with WPM.

"The affirmative association of a potentially incendiary social-media post with the employer of the writer of the post could be relevant to a reader and would certainly be relevant to the employer. In fact, one of WPM's partners admitted to Flickinger that he 'did not understand social media' and was not 'on social media.' It would be reasonable to conclude that he believed that readers of the post might make this false association. Thus, under these circumstances, we agree with

37

Flickinger that the nature of this social-media post was in fact 'false.'"

Flickinger, 385 So. 3d at 512-13.

Thus, this Court has already concluded that the type of "counterfeit" social-media post that King shared with Wainwright and Pope -- one that "paired" the WPM photograph with the George Floyd post -- constitutes "false" information. Flickinger, 385 So. 3d at 513. King does not dispute that conclusion but argues that he merely "truthfully informed Wainwright [and Pope] of the existence of the 'counterfeit' post" and "let[] [them] know that an individual named Shawn Avery had made [the] post." Brief in support of application for rehearing, pp. 4-5. However, when King texted the "screenshot" to Wainwright and Pope, he did not clarify that it was Avery who had "t[aken] [the George Floyd] post and paired it with" the WPM photograph to create a "counterfeit" social-media post. Instead, when Pope asked if "that" was "on [Flickinger's] FB," King merely replied, "Yes. His FB," which could have led Wainwright and Pope to believe, incorrectly, that it was Flickinger who had posted the WPM photograph on his Facebook page in conjunction with the George Floyd post. Indeed, when asked during his deposition if he was aware that it was Avery who had "paired" the WPM photograph

with the George Floyd post, Wainwright testified: "That's what I understand <u>now</u>." (Emphasis added.) Thus, when considered in a light most favorable to Flickinger, the information King provided to Wainwright and Pope was at least potentially misleading and therefore provides a basis upon which a jury could potentially find that King did not give Wainwright and Pope "truthful information." § 772(a). <u>See</u> <u>EPIC Holdings</u>, 335 So. 3d at 1138 (holding that "questions of fact exist" with respect to the defendant's justification defense asserted under § 772 of the <u>Restatement</u> because, "when the evidence is viewed in a light most favorable to [the plaintiff], it becomes apparent that [the defendant's] statements … potentially were misleading").

A justification defense in a tortious-interference case " 'is generally a jury question,' " <u>EPIC Holdings</u>, 335 So. 3d at 1134 (citation omitted), and, based on the record before this Court, we cannot say that this case is an exception to that general rule. In other words, given the evidence before us, we conclude that reasonable minds could disagree as to whether King gave Wainwright and Pope "truthful information," § 772(a), which is to say that there is a question of fact as to that issue, and that question must be resolved by a jury, not this Court. Thus, King's

justification defense does not provide this Court with a "'valid legal ground'" for affirming the summary judgment issued in his favor. <u>Murey</u>, 385 So. 3d at 912 (citation omitted).

In sum, the circuit court erred by issuing a summary judgment in King's favor because there are genuine issues of material fact as to both the causation element of Flickinger's tortious-interference claim and King's justification defense. Thus, we reverse the summary judgment with respect to King and remand the case for further proceedings. We of course express no opinion on the ultimate merits of Flickinger's claim or King's justification defense; those are questions for a jury to resolve. We merely hold that there is enough evidence for Flickinger's tortious-interference claim to survive King's summary-judgment motion.

## III.

Flickinger has raised one other argument on appeal, which is that the circuit court erred by denying his motion to compel the production of King's cellular-telephone records and by denying his motion to continue the summary-judgment hearing so that he would have time to obtain those records. The decision to deny those motions was a decision within the circuit court's discretion, and its rulings on those motions will not be

reversed unless the court clearly exceeded its discretion. See Ex parte CSX Transp., Inc., 374 So. 3d 690, 703 (Ala. 2022); and Alabama River Grp., Inc. v. Conecuh Timber, Inc., 261 So. 3d 226, 255 (Ala. 2017).

Regarding a motion to compel discovery, this Court has explained that, "[i]n order for … matter to be discoverable, the information sought must … be relevant." Zaden v. Elkus, 881 So. 2d 993, 1005 (Ala. 2003). Here, Flickinger filed a motion to compel the production of King's cellular-telephone records during "the June 2020 timeframe when he was terminated from WPM" because, he says, those records are "crucial to [his] tortious interference claim where he is alleging that his termination was the product of [King's] communications." Flickinger's brief, p. 64. Specifically, Flickinger argues that King sent "misleading and disparaging text messages" about him to "WPM and others" during that time. Flickinger's reply brief, p. 24. However, Flickinger has failed to demonstrate how King's cellular-telephone records from June 2020 (or any other time) would provide him with any relevant information.

First, it is undisputed that King sent Wainwright and Pope the "screenshot" containing the George Floyd post, and that "screenshot" is in the record. Thus, with respect to that aspect of King's actions, his

cellular-telephone records would yield no relevant information that Flickinger does not already have. That said, it is also undisputed that King deleted other text messages that he had sent around the same time that he sent the George Floyd post to Wainwright and Pope, and Flickinger argued during the summary-judgment hearing that he would "be able to tell through cell phone subpoenas who [King] texted" and "whether there were images attached to text messages." However, Flicker conceded during the summary-judgment hearing that he was "not asking for the content of [King's] text messages" and that "[t]hese subpoenas never produce the content of the text messages." Thus, without the content of the text messages, we fail to see how King's cellular-telephone records would provide Flickinger with evidence indicating that King had sent the WPM partners other "misleading and disparaging text messages."

Flickinger also argued during the summary-judgment hearing that "[g]eolocation data is important … because maybe [King] was with [Wainwright] and [Pope] and [McMeekin] when he texted images to them." However, Flickinger did not explain to the circuit court, nor has he explained to this Court, why it would be relevant that King and the

WPM partners were together when King sent them the "screenshot" containing the George Floyd post or any other text messages.

Finally, Flickinger argued during the summary-judgment hearing that King's cellular-telephone records would indicate whether King had sent other attorneys the "screenshot" containing the George Floyd post or any other "misleading and disparaging text messages," which, he argued, was "important information to know." However, Flickinger did not explain to the circuit court, nor has he explained to this Court, why it would be relevant that King sent such messages to other attorneys. Moreover, even if that fact would be relevant, we once again note Flickinger's concession that King's cellular-telephone records would not provide him with the content of King's deleted text messages, so, at most, those records would indicate only that King had sent text messages containing images to other attorneys; the records would not, by Flickinger's own admission, indicate that King had sent the "screenshot" containing the George Floyd post or any other "misleading and disparaging text messages" to other attorneys.

Because Flickinger has not demonstrated that King's cellular-telephone records would provide him with any relevant information, we

43

cannot say that the circuit court exceeded its discretion by denying Flickinger's motion to compel the production of those records. As for Flickinger's argument that the circuit court erred by denying his motion to continue the summary-judgment hearing, the purpose of that motion was to afford Flickinger time to obtain King's cellular-telephone records, which, as we have just explained, Flickinger failed to prove would be relevant. Thus, because that was Flickinger's only basis for seeking a continuance, the circuit court did not exceed its discretion by denying Flickinger's motion to continue the summary-judgment hearing.

Conclusion

For the reasons set forth in this opinion, we affirm the summary judgment with respect to the King law firm. However, we reverse the summary judgment with respect to King and remand the case for further proceedings consistent with this opinion.

APPLICATION OVERRULED; OPINION OF MAY 9, 2025, WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.

Stewart, C.J., and Wise, Sellers, and Lewis, JJ., concur.